CROMMELIN v. MINTER, ET AL.

1. The first article of the treaty of 1814, with the Creek Indians confers upon the chiefs and warriors provided for, a qualified inheritable estate, which is determined by the sale of the reservee, the cesser of occupation, and his removal from the State. and immediately upon such abandonment of possession, the reservation becomes a part of the public domain, without any positive assertion of right on the part of the United States.

2. Though the title to a reservation under the first article of the treaty of 1814, with the Creek Indians be vested in the United States by the *voluntary abandonment* of the reservee, it is not subject to entry under the pre-emption laws of Congress.

3. A patent fraudulently obtained, or which has issued in violation of law, is void, and does not authorize a recovery against a party in possession under color of title. But a mere intruder cannot insist upon the invalidity of

the patent; and where the defendant offers no evidence to justify his possession, the fair inference is, that he is an intruder.

4. *Quere?* May not the plaintiff in ejectment recover against a trespasser, upon proof of previous possession, without any documentary evidence of title.

5. The jury returned a verdict in favor of plaintiffs for "fifty acres of the south-east fractional quarter of fractional section 24, in township 18, of range 18, in the district," &c,; the judgment substantially conformed to the verdict—*Held*, that the verdict did not sufficiently identify the land, to entitle the plaintiff to a judgment, under which the sheriff could deliver the possession of any specific part of the land.

Writ of Error to the Circuit Court of Coosa.

ACTION of trespass to try title. The land described in the declaration, is the south-east fractional quarter of fractional section 24, of township 18, of range 18. The verdict is, that the jury find for the plaintiffs, and "that the right and title to the said land, in the said plaintiffs' declaration mentioned, to wit: fifty acres of the south-east fractional quarter of fractional section 24, of township 18, of range 18, to be in the said plaintiffs," and damages are assessed at $140 62. The judgment is, that the plaintiffs recover of the defendant "the land in the said plaintiffs' declaration mentioned, to wit: the lands aforesaid," &c.

At the trial, the plaintiffs gave in evidence a patent, under the seal of the general land office, in these terms:

*The United States of America.*
PRE-EMPTION CERTIFICATE—No. 35,014.
To all to whom these presents shall come, greeting:

Whereas, William T. Minter, Hiram F. Saltmarsh, and Ashley Parker, assignees of Isham Bilberry, and Samuel Lee, have deposited in the general land office of the United States a certificate of the register of the land office at Cahawba, whereby it appears that full payment has been made by the said Isham Bilberry and Samuel Lee, according to the provisions of the act of Congress of the 22d April, 1820, entitled an act making further provision for the sale of the public

lands, for the south-east fractional quarter of section 24, of township 18, of range 18, in the district of land subject to sale at Cahawba, Alabama, containing 150 66-100 acres, according to the official plat of the survey of said lands, returned to the general land office by the surveyor general; which said tract has been purchased by the said John Bilberry and Samuel Lee.

Now, know ye, that the United States of America, in consideration of the premises, and in conformity with the several acts of Congress, in such case made and provided, have given and granted, and by these presents do give and grant, unto the said William T. Minter, Hiram F. Saltmarsh, and Ashley Parker, and to their heirs, the said tract above described, to have and to hold, &c. &c. This was issued the 10th day of October, 1840.

The defendant gave in evidence, a certificate in these terms:

*No. 28.*          *General Land Office, 12 April, 1820.*

I certify, that in pursuance of an act of Congress passed on the 3d of March, 1817, entitled "an act making provision for the location of the lands reserved by the 1st article of the treaty of the 9th of August, 1814, between the United States and the Creek Nation to certain chiefs and warriors of that nation, and for other purposes." The Secretary of the Treasury has confirmed the claim of Tallasse Fixico, (being No. 28,) and that the said Tallasse Fixico, is entitled to occupy the following lands, agreeably to the provisions of the said act, viz : a fraction in section 24, of township 18, of range 18, on the east side of the Coosa river. Also, the north-west quarter of section 30, township 18, of range 19, &c. &c.

This was issued under the seal of the general land office, of the date of the caption, and is signed by the commissioner of that bureau.

The defendant also proved, that the lands embraced in this certificate, were the lands in controversy.

It was also proved, that Tallasse Fixico sold his reserve in 1828 or 9, and afterwards left the State, and emigrated with his tribe, west of the Mississippi, in 1832 or 3,

There was no evidence that the United States had taken any steps to ascertain whether the lands reserved had been abandoned by Tallasse Fixico, within the meaning of the treaty, prior to the issuance of the patent to the plaintiffs.

The defendants proved that the plaintiffs obtained their patent for the land in controversy, under the pre-emption act of 1833.

The defendant asked the following instructions to the jury :

1. The certificate of possession was evidence that Tallasse Fixico was entitled to a possessory right in the land sued for, under the treaty of Fort Jackson.

2. That before the United States would be authorized to take possession of said land, and grant the same to the plaintiffs, so as to invest them with the fee, it was necessary to determine the fact of a voluntary abandonment by Fixico, by a proceeding in the nature of an inquision, or office found ; and that unless such abandonment had been ascertained, that the patent to the plaintiffs was issued improperly.

3. That before the plaintiffs could recover in this action, they must show that some steps were taken by the government, to ascertain the fact of abandonment, if there was any, by the reservee, and that he was notified of the intended issuance of the grant to the plaintiffs, based upon such supposed abandonment under the treaty.

4. That the land in controversy was excepted from the operation of the pre-emption laws of the United States, and that the patent vested no title in the plaintiffs.

The first of these charges was given, but with the further charge, that a removal from, or sale of the land, by the reservee, would be a voluntary abandonment under the treaty, and would authorize the government to grant it : and that no inquest, of office, or similar proceeding was necessary, to ascertain the fact of abandonment, previous to the issuance of a patent.

The other charges were refused. The defendant excepted to the refusal to charge, and to the charge given. These matters are now assigned as error ; and it is also urged that the judgment does not follow the verdict.

G. C. BALL, for the plaintiff in error, made the following points: 1. There never has been a "voluntary abandonment" of the premises in question within the sense of the the treaty of 1814. These terms were not used for the purpose of restraining the right of alienation. The terms "voluntary abandonment," in the treaty, were employed to signify that before the right of possession could accrue to the United States, the will of the grantee must unite with the specific act required; and the *voluntary* surrender to the government be clearly evinced by an act which demonstrated the intention. [Paine's Rep. 457: Pet. C. C. Rep. 308; Wheat. R. 543.]

2. If there was a "voluntary abandonment" of the possession, within the sense of the treaty, the United States have not taken any steps to avail themselves of it. As the law points out no other mode of proceeding by the government, in order to obtain the possession, an inquest of office, or a proceeding in nature thereof should have been resorted to. [4 Plow. Rep. 484; 3 Dall. Rep. 199; Cranch's Rep. 87; 11 Wheat. Rep. 332.]

3. If the reserve had vested in the United States by "voluntary abandonment" of the reservee, without any act done indicative of an intention to claim it, it is then insisted, that it is expressly exempted from the influence of the pre-emption laws, and that the patent under which the plaintiff's claim as pre-emptors, is void. [1 Wheat. Rep. 115, 155; 5 Id. 293; 12 Wheat. Rep. 586.]

4. The verdict is too indefinite and uncertain to sustain a judgment; and they do not harmonize with each other. [4 Stew. & P. Rep. 365; 8 Por. 317; 3 Stewart 75; 1 Johns. Cases, 101; 1 Munf. Rep. 162.

G. W. GAYLE, for the defendant in error, insisted—1. The *patent* which the plaintiffs below introduced in evidence, in support of their action, and the proof of possession in defendant below, was sufficient to authorize a recovery; and was surely evidence of paramount title compared with the certificate of possession of *Tallasse Fixico*, in a court of law.

The treaty of Fort Jackson, of 1814, gave the Indian occupant a right to his reserve, only so long as he continued in

the occupancy ; Tallasse Fixico having sold in 1828 and 9, and left its possession, his right ceased.

2. The treaty does not contemplate the singular idea of "*office found*," by the United States, before a patent can issue.

3. The judgment *does* follow the verdict of the jury, except in this, that in the judgment, the *quantity* of land is left out, found by the verdict. Of this the defendant below cannot complain, as he is not injured by it, and cannot be. The plaintiffs below may be unable to get a good writ of *habere facias possessionem*, under the judgment as it now stands.

The Supreme Court having the power to give such judgment as the Circuit Court should have given, is asked to correct the judgment below, so as to make it correspond with the verdict, and allow an *habere facias* successfully to issue.

COLLIER, C. J.—It was conceded by the Circuit Court, that the certificate of the commissioner of the general land office, furnished evidence of the right of Tallasse Fixico to occupy the premises in question, under the first article of the treaty of 1814, with the Creek Indians. But it was denied that any judicial or other proceeding was necessary on the part of the United States, in order to ascertain the reservee's abandonment, before the government could grant or dispose of the land.

The first article of the treaty referred to, provides, " that where any possession of any chief, or warrior, of the Creek Nation, who shall have been friendly to the United States, during the war and taken an active part therein, shall be within the territory ceded by these articles to the U. States, every such person shall be entitled to a reservation of land within the said territory, of one mile square, to include his improvements as near the centre thereof as may be, which shall inure to the said chief or warrior, and his descendants, as he or they shall continue to occupy the same, who shall be protected by, and subject to, the laws of the United States ; but upon the voluntary abandonment thereof by such possessor, or his descendants, the right of occupancy or possession of said lands shall devolve to the United States,

and be identified with the right of property ceded hereby." An act of Congress passed in 1817, in relation to this subject, so far as it relates to the tenure by which the reservations are to be held, is substantially the same as the treaty.

By the 8th article of the treaty of 1817, with the Cherokee Indians, there is a reservation of six hundred and forty acres of land to each head of a Cherokee family residing east of the Mississippi river, " in which they will have a life estate with a reservation in fee simple to their children, reserving to the widow her dower," &c. " *Provided,* that if any of the heads of families, for whom reservations may be made, should remove therefrom, then, in that case, the right to revert to the United States." Under this *proviso,* we held, that a reservee could make no disposition of the land set apart to him, incompatible with his own occupancy ; and if he did, it would return to the United States as it was acquired by the treaty, *in fee simple.* We said further, " Where an estate is conveyed by the deed of an individual or corporation, subject to be defeated by the breach of a condition subsequent, if the condition is broken, it is necessary that the grantor, or person authorized to take advantage of it, should either enter, or do some other act equally effectual, in order to divest the estate. But if an estate is granted by a legislative act, (of which character treaties are by the constitution of the United States,) subject to forfeiture by the happening of some future event—if the event occur, no. act is necessary to revest the estate in the government. It revests immediately upon the happening of the contingency. [Kennedy and Moreland v. McCartney's Heirs, 4 Porter's Rep. 141 ; see also, University of Ala. v. Winston, 5 Stew. & P. Rep. 17 ; Gill v. Taylor, 3 Porter's Rep. 182.]

The Secretary of the Treasury of the United States, in 1837, requested the opinion of the Attorney General upon all the material points arising in this case. In answer to which it was said, that " those circumstances, and those only, by which the party ceases to *occupy* the reservation, should be considered as constituting an *abandonment* thereof. I cannot particularly define them in advance, further than to say, they must be voluntary and unequivocal ; leaving no reasonable doubt either as to the intention of the par-

Crommelin v. Minter, et al.

ty, or as to the fact itself." Where the reservee had occu-
pied and cultivated his reservation until 1833, and then leas-
ed it by an agreement in writing, reserving rent, and remov-
ed to another State, in which he continued to reside, it was
considered to be a clear case of voluntary abandonment.
Whenever he ceased to have a direct personal connection with
the use and enjoyment of the land, he could no longer be
regarded as an occupant.

It was further said, that the terms of the treaty created
what was technically called a *collateral limitation*—giving
to the Indian descendants a qualified inheritable estate, de-
terminable on the *cesser* of occupation. and the voluntary
abandonment of the premises. Hence, the Attorney Gene-
ral concluded, that no judicial proceedings, or actual entry
on the part of the government was necessary to vest the es-
tate in the United States; the estate of the grantee deter-
mines, the moment the event upon which it is limited, aris-
es, and if the possession be vacant, the United States might
immediately take possession and sell: if occupied, the occu-
pant would be in the same predicament with every one who
had entered upon the public lands without authority. It was
also added, that "whenever the estate of the Indian reservee
shall have determined, the land becomes part of the public
domain." [See Ins. and Ops. respecting Pub. Lands, ed. of
1838, part 2, pp. 121-2.]

These citations are directly in point, and seem to us to re-
sult most obviously from the terms of the treaty. Surely, the
sale made by Tallasse Fixico, in '28 or '29, and his removal
west of the Mississippi, conclusively indicate the intention
to abandon the possession, and must in the absence of proof
be presumed to have been voluntary. This being the case,
his reservation vested in the United States, to be held by
the same tenure as the great body of the land which was ac-
quired by the treaty. The provision we are considering is
too explicit to leave room to doubt that a sale and removal
is not a voluntary abandonment. It may be thought to be
oppressive upon the Indian, and not promotive of the nation-
al welfare, to force him to renounce the associations of his
youth, and it may be, the companionship of maturer years,

for the enjoyment of which only he is fitted, for the sake of a home amongst strangers, with no affinity of tastes and pursuits, which he is not permitted to dispose of at pleasure. But it is enough to say,*ita scripta est lex.*

In order to consummate the title of the U. States to a reservation, the possession of which has been abandoned, we have seen that no legal proceeding, or entry is necessary—it vests *eo instanti* the occupancy voluntarily ceases. The cases cited from our own reports fully settle this point.

It is however insisted, that the premises having been reserved under the treaty of 1814, were not subject to entry under the pre-emption laws of Congress. The act of 1830, the provisions of which have been continued in force by several subsequent enactments, provides, "That every settler, or occupant of the public lands, prior to the passage of this act, who is now in possession, or cultivated any part thereof in the year one thousand eight hundred and twenty-nine, shall be, and he is hereby authorized to enter with the register of the land office for the district in which such lands may lie, by legal subdivisions, any number of acres, not more than one hundred and sixty, or a quarter section, to include his improvement, upon paying to the United States, the then *minimum* price of said land. *Provided, however,* no sale or entry of any land shall be made, under the provisions of this act, which shall have been reserved for the use of the United States, or either of the several States, in which any of the public lands may be situated." *Further,* "nor shall the right of pre-emption contemplated by this act, extend to any land which is reserved from sale, by act of Congress, or by order of the President, or which may have been appropriated for any purpose whatsoever. [Laws, &c. respecting Pub. Lands, ed. 1838, pp. 473-4.]

It may be conceded, that the setting apart of the premises in question to Tallasse Fixico under the stipulations of the treaty, is not a reservation for the *use of the United States, or of this State,* and still it does not follow, that it is subject to entry as a pre-emption. Wilcox v. Jackson, 13 Peters' Rep. 498, though in its facts unlike the present case, yet in principle, they are not dissimilar. There the premises in

question were occupied during different periods, and for the greater part of the time between 1804 and the commencement of the suit in 1835 or 6, as a military post by the United States. Baubean, under whom the plaintiff's lessor deduced his title, in 1817, bought of an army contractor a house built on the land, to which was attached a garden or field, of which he continued in possession until 1836. The factory houses were sold under an order of the war department in 1823, and purchased by Baubean for five hundred dollars; of these he took possession and continued to occupy them and cultivate the land, until the suit was commenced. In 1821, the land was surveyed by the United States, and in 1824, at the instance of the Indian agent at Chicago, the Secretary at War requested the commissioner of the general land office to reserve this land for the accommodation and protection of the property of the Indian agency—the Secretary at War having been informed several years previously, by the commissioner, that he had reserved it for military purposes. In 1831 and 1834, Baubean claimed the land in question, under the pre-emption law, and in 1832 he was informed by the commissioner of the land office, that the same was reserved for military purposes. In 1835 his claim was allowed at the local land office in Illinois; he paid the purchase money and obtained the register's certificate. It was held, that Banbean acquired no title to the land by his entry, that the right of the United States was not divested thereby, or any of his previous acts. *Further*, that an appropriation of land by the government, is nothing more or less than setting it apart for some peculiar use.

We have seen that the act of 1830 declares, that the right of pre-emption which it contemplates, shall not extend to any land which is reserved from sale by act of Congress, or by order of the President, or which may have been appropriated for any purpose whatsoever. Under this provision, it was held, in the case last cited, that a reservation of lands made at the request of the Secretary at War for purposes in his department, must be considered as made by order of the President. " Whensoever," it was said, " a tract of land shall have once been legally appropriated to any purpose from that moment, the land thus appropriated becomes severed from

the mass of public lands; and no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it; although no other reservation were made of it." This latter remark of the court is confessedly emphatic; but the provision of the act under consideration is explicit in its terms, and expansive in meaning. It declares that land "which may have been appropriated for any purpose whatsoever," shall not be subject to pre-emption.

The Creek treaty of 1814, ceded to the United States all the lands within certain defined limits, and stipulated to allow reservations to the friendly chiefs, or warriors, of the nation, who had taken an active part in the war which had just terminated. The land then set apart to Tallasse Fixico was an appropriation *pro tanto* to himself, and his descendants, as he or they should continue to occupy the same, and until its voluntary abandonment by him or them.

It may perhaps not be easy to perceive why lands in the predicament of the premises in question should be excluded from the operation of the pre-emption laws, as the appropriation was no longer continuing, and not only the fee, but the right of possession revested in the United States. It may, however, be said, that the right of pre-emption was a bounty extended to settlers and occupants of the public domain. This bounty it was competent for Congress to limit at pleasure, without assigning a reason for the limitation; and thus make its will stand for a reason.

The fact that the plaintiffs have obtained a patent, cannot place them in a condition which prevents the defendant from gainsaying their title, if he is in a predicament which authorizes him to make such a defence. In Bagwell v. Broderick, 13 Peters' Rep. 436, it was held that a patent from the United States for a part of the public lands, is conclusive in an action at law. If those who claim to hold the land against the patent, can show that it issued by mistake, then the equity side of the Federal Circuit Court is the proper forum; and a bill, the proper remedy to investigate the equites of the parties. But if thss case be recognized as an authority, it cannot be applied where a patent has been fraudulently obtained, or has issued in violation of law. Stoddard, et al. v. Chambers, 2 How. Rep. 284, it was said, that

"the issuing of a patent is a ministerial act, which must be performed according to law. A patent is utterly void and inoperative, which is issued for land which had been previously patented to another individual. The fee having been vested in the patentee by the first patent, the second could convey no right. It is true a patent possesses the highest verity. It cannot be contradicted or explained by parol, but if it has been fraudulently obtained or issued against law, it is void. It would be a most dangerous principle to hold that a patent should carry the legal title, though obtained fraudulently or against law. Fraud vitiates all transactions. It makes void a judgment, which is a much more solemn act than the issuing a patent. The patent of the defendant having been for land reserved from such appropriation, is void." See also Ladiga v. Roland, et al. 2 How. Rep. 581 ; Lessee of Pollard's Heirs v. Files, 3 Ala. Rep. 47. These cases we think very fully establish, that the patent being the mere consequence of the entry made by the plaintiffs under the pre-emption laws, cannot divest the United States, or any one else having *an acknowledged right,* of the legal title.

It is a general rule, that to entitle the plaintiff to recover in an ejectment or trespass to try title, he must show *prima facie,* a legal title. But is it competent for the mere occupant of a portion of the public lands to defeat a recovery against him by showing that a patent from the United States to the plaintiff, in proper form, is void, because the land had been withdrawn from sale under the influence of an act of Congress, previous to the plaintiff's purchase ?

The defendant often defeats the *prima facie* case made out by the plaintiff, by proof of a better outstanding title subsisting in a third person. [Lessee of Foster v. Joice, 3 Wash. C. C. Rep. 498 ; Lessee of Griffith v. Bradshaw, 4 Id. 171 ; Sand. on Plead. & Ev. 455–474 ; Klock v. Hudson, 3 John. Rep. 375 ; Jackson v. Harrington, 9 Cow. Rep. 86.] In Jackson v. Harder, 4 Johns. Rep. 202, the plaintiff proved that he had been in possession of the premises for eight or ten years, under a claim or color of title ; the Court said "that the plaintiff showed enough in the first instance to entitle him to recover ;" but "in what way the defendant succeeded to the possession, does not appear. It is not stated,

or alledged, that he entered under any pretence or color of title, and the natural and just inference seems to be that he entered upon the possession that had been left, as an intruder, without title. In that case, the possession of the plaintiff was sufficient to entitle him to recover, and the entry of the defendant must be considered as a trespass, according to the decision in Jackson v. Hazen, 2 Johnson's Reports, 22. The defendant is either an intruder, or he entered" under one who occupied by the permission of the lessors of the plaintiff; "and in either case, he is precluded from questioning the plaintiff's right of possession." The defendant in that case attempted to set up an outstanding title still subsisting. In respect to which, the court remarked : "The first question which presents itself here, is, whether a mere intruder can be permitted to protect his intrusion under an outstanding title in a stranger. I think not. The rule has been carried so far, and it would be a violation of just principle to apply it to the case of a trespasser who enters upon another's possession without pretence of title." (See Perryman's Lessee v. Callison, 1 Tenn. Rep. 515; Jackson v. Hudson, 3 Johns. Rep. 375.)

It has been held, that where two grants bear the same date, neither can prevail against the other—it is sufficient for the defendant to show that his possession is consistent with one of the grants, and by consent of the patentee, without deriving a legal title to himself; but he must connect himself in some manner with the grant of even date. [Coleman v. Talbot, 2 Bibb's Rep. 129; Talbot v. Callaway, Hardin's Rep. 35; see 4 Bibb's Rep. 529.] Where a defendant was in possession under color of right, which perhaps, in equity, might be the superior title to the land, he was permitted to defeat a recovery by setting up a paramount *legal title* in a stranger—the court placing its opinion upon the ground that he was not a wrong-doer. [Fowke v. Darnall, 5 Litt. Rep. 316. See also 10 John. Rep. 23.]

In the present case, there is no proof how and when the defendant acquired the possession. It does not appear that he came in under Tallasse Fixico, or any one who occupied under a contract with him. The fair inference is, that he is

an intruder, and this presumption is very strong, if we are to receive the patent as indisputably valid against one who shows no color of right. In Wilcox v. Jackson, *supra*, it was said that "the decision of the register and receiver of a land office, in the absence of fraud, would be conclusive as to the facts that the applicant for the land was then in possession, and of his cultivating the land during the preceding year; because these questions are directly submitted to those officers." If this principle of law can be applied to the case before us, then it may be assumed that the assignors of the plaintiffs, whose names are set out in the patent, were in possession when the purchase from the United States, was made; and we must suppose, that the defendants subsequently entered and occupied the premises, either by the permission of the plaintiffs, or their assignors, or that he is a trespasser. An entry under such circumstances, would prevent him from setting up the unauthorized purchase under the pre-emption law, and insisting that the title still remains in the United States.

But if the patent were out of the way, it might perhaps be allowable for the plaintiffs to recover without the aid of documentary proof, upon establishing a previous possession, and that the defendant was as against them, a trespasser. [Woods v. Lane, et al., 2 Sergt. & R. Rep. 53; Bassler v. Naisley, et al., Id. 352; Stodder v. Powell, 1 Stew. Rep. 287; Nicholson v. Lecatt, Id. 590,] But we forbear to pursue this inquiry; for we have already seen that the defendant is not in a condition to gainsay the patent, or to set up an outstanding title to defeat it.

It is objected that the judgment and verdict are too uncertain, and consequently insufficient. The verdict is as follows: "We the jury do find in favor of the said plaintiffs, and we find the right and title to the said land in the said plaintiff's declaration mentioned, to-wit: fifty acres of the south east fractional quarter of fractional section twenty-four in township eighteen, of range eighteen, in the district of lands, subject to sale in Cahaba, Alabama, to be in said plaintiffs, and assess plaintiffs damages, by reason of the trespass in the plaintiff's declaration mentioned, to the sum of

one hundred and forty 62½-100 dollars." On this verdict a judgment was rendered " that the said plaintiffs do recover of the said defendants the land in the said plaintiff's declaration mentioned, to-wit, the lands aforesaid, and that said plaintiffs do have their writ of *habere facias possessionem*," &c.

If the jury had found that the defendant was guilty of a wrongful entry upon fifty acres, part of the premises in question, perhaps their verdict would have been sufficiently certain, but they went beyond this and affirmed that the plaintiffs had a title to so much of the land, leaving it to be inferred that the title to the residue was in the defendant or some one else. It is impossible to ascertain from the record in what part of the fractional quarter section, the plaintiffs fifty acres are situated. How then can a sheriff be informed of what he is to deliver possession ? We think the uncertainty of the verdict is too great to be sustained, and that the previous decisions of this Court are conclusive against the plaintiffs, upon this point. [See Jenkins v. Noel, 3 Stewt. R. 75; Sturdevant v. Murrell's heirs; 8 Porter's Rep. 317, and cases there cited ; Huffaker v. Boring, 8 Ala. Rep. 87, and cases there cited.]

In respect to the non-conformity of the judgment to the verdict, that perhaps would be considered a clerical misprision, and amendable, if the verdict would support a judgment.

It results from what has been said, that the judgment of the Circuit Court must be reversed, and the cause remanded.