# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## OCTOBER TERM, 1860.

DOLL v. MEADOR et al.

CALIFORNIA, upon her admission into the Union, acquired, under the eighth section of the Act of Congress of September 4th, 1841, entitled "An Act to Appropriate the Proceeds of the Sales of the Public Lands, and to Grant Pre-emption Rights," a vested and present interest in 500,000 acres of land, with a right to select and locate the same, in such manner as her Legislature might direct, out of any of the public lands of the United States, except such as were or might be reserved from sale by any law of Congress, or the proclamation of the President.

This right of selection or location was not suspended until the United States had made their surveys, but locations made previous to the survey of the United States were subject to change, if, subsequently, upon the survey being made, they were found to want conformity with the lines of such survey. With this qualification, and the further qualification of a possible reservation by a law of Congress, or a proclamation of the President, previous to the survey, which might have required further change, or the entire removal of the location, there was no limitation upon the right of the State to proceed at once to take possession and dispose of the quantity to which she was entitled by the grant.

Conformity in the locations with the sectional divisions and subdivisions of the United States survey is required, to preserve intact the general system of surveys adopted by the Federal Government, and to prevent the inconvenience which would ensue from any departure therefrom.

The laws of this State, authorizing the selection or location of lands under the Act of Congress, provide for securing conformity in the locations with the lines of the Government survey.

Doll *v.* Meador.

The effect of a location pursuant to the laws of California, upon lands subject to location, is to make particular the general grant of the Federal Government, and to vest an absolute and perfect title to the same, which the State may, by her patent, convey.

Neither the tenth section of the Act of 1841, nor the Act of May 23d, 1844, entitled " An Act for the Relief of Citizens of Towns upon the Lands of the United States, under certain circumstances ; " nor the Act of March 3d, 1853, providing " for the Survey of the Public Lands in California, the Granting of Pre-emption Rights therein, and for other purposes," in effect, reserve town sites from sale.

The Municipal Pre-emption Act of May 23d, 1844, confers a right upon the corporate authorities or County Judges, to purchase the land forming a town site, at the minimum Government price, for the benefit of the inhabitants thereof, before the commencement of the public sale of the body of the land in which the town site is included—and if such right be not exercised, such lands, with the general mass, are offered for sale to the public.

The lands in controversy were not reserved from sale by the laws of the United States, or by the proclamation of the President, and consequently, were subject to location by the State of California, under her laws ; and the patent of the State properly issued to the plaintiff in this cause.

The patent is the record of the State that the land was subject to location under the grant of the United States, and has been located, through her officers, in pursuance of the terms of the donation, and as against parties who have no higher right than that which arises from mere occupation, it imports absolute verity.

If a patent be void upon its face, it may be assailed at any time and in all cases, for it is itself record evidence of the matter which renders it a nullity. If it be issued in the absence of legislation directing a disposition of the property described, or by an officer who is not invested with power to sign the same, or for an estate prohibited, its validity may also be controverted in any action, either directly or collaterally ; but if the authority to issue the patent depend upon the existence of particular facts in reference to the condition or location of the property, or the performance of certain antecedent acts, and officers have been appointed for the ascertainment of these matters in advance, who have passed upon them, and given their judgment—then the patent, though the judgment of the officers be, in fact, erroneous, cannot be attacked collaterally by parties showing title subsequently from the same source, much less by those who show no color of title in themselves. In such cases, the parties without title cannot be heard at all, and the parties with subsequent title must seek their remedy by *scire facias,* or bill, or information, to revoke the first patent, or limit its operation.

A patent not void upon its face, cannot be questioned, either collaterally or directly, by persons who do not show themselves to be in privity with a common or paramount source of title.

The defendants in this case stand in no privity with the United States, and possess no claim, legal or equitable, to the lands upon which they are settled—inasmuch as they failed to accept the proffered offer of the general Government to invest

them with title through the action of certain officers—and, therefore, cannot be heard in opposition to the patent which the plaintiff holds from the State of California.

The case of *Summers* v. *Dickinson* (9 Cal. 554) explained and qualified.

New States, under the Act of September 4th, 1841, acquire their interest upon their admission into the Union, and may make selections of land before the survey of the United States—which selections are only subject to three qualifications: 1st, they must not be of lands reserved from sale by any law of Congress or the proclamation of the President; 2d, they must be in parcels of not less than three hundred and twenty acres each; and 3d, the parcels selected must be in such form as to correspond with the survey of the United States, when made.

State selections will not become absolute and definite until the survey—until then, the parcels selected may be subject to a possible reservation from sale; and when there is no such reservation, they may require some change in their exterior lines, so as to conform to the official sectional divisions and subdivisions. In the legislation of the State, provision is made so as to secure such conformity.

APPEAL from the Fifteenth District.

This was an action of ejectment, to recover possession of a lot in the town of Red Bluff, in Tehama county, based upon a title vested in the plaintiff by virtue of the following patent:

UNITED STATES OF AMERICA, STATE OF CALIFORNIA.

" *To all whom these presents shall come, Greeting:*

"Whereas, under the provisions of an Act of Congress of the United States, entitled "An Act to Appropriate the Proceeds of the Sales of the Public Lands, and to Grant Preëmption Rights," approved September 4th, 1841, 500,000 acres of the public lands were granted to the State of California;

"And whereas, the Legislature of the State of California provided for the selection and location of the 500,000 acres of land, under and in pursuance of said act of Congress, by the following Acts of the Legislature, to wit:

"An act entitled 'An Act to provide for the Disposal of the 500,000 Acres of Land granted to this State by Act of Congress, that the People of the State of California may avail themselves of the benefit of the eighth section of the Act of Congress, approved April 4th, 1841, chapter sixteen, entitled an Act to Appropriate the Proceeds of the Sales of the Public Lands, and to grant Preëmption Rights, the following provisions are hereby enacted;' approved May 3d, 1852; and also an act entitled 'An Act Authorizing the Location and Patenting of

20

School Lands,' approved April 30th, 1857 ; also an act entitled 'An Act to provide for the Location and Sale of the unsold portion of the 500,000 Acres of Land donated to the State for School Purposes, and the seventy-two sections donated to the State for the use of a Seminary of Learning,' approved April 23d, 1858.

"And whereas, the Legislature of the State of California passed an act entitled 'An Act to provide for the Issuance of Patents of Lands located with State School Land Warrants, and for Lands purchased under the Act of April 23d, 1858,' approved April 16th, 1859.

"And whereas, it appears by the certificate of the Register of the State Land Office No. 1, issued in accordance with the provisions of said last named act, bearing date the fourth day of June, 1859, that the tracts of land hereinafter described have been duly and properly located, in accordance with the provisions of the said laws of this State ; and that J. Granville Doll is entitled to receive a patent therefor.

" Now, therefore, the State of California hereby grants to the said J. Granville Doll, and to his heirs and assigns forever, the said tracts of land, located as aforesaid, and which are known and described as follows, to wit:

" The east half of the south-east quarter of section nineteen, and the fractional south-west quarter of section twenty, and the north half of the north-west quarter of section twenty-nine, in township twenty-seven north, range three, west of Monte Diablo, meridian, containing two hundred and ninety-six and seventy-seven one-hundredths acres, taken in lieu of three hundred and twenty acres ; together with all the privileges and appurtenances thereunto appertaining and belonging.

" To have and to hold the afore-granted premises to the said J. Granville Doll, and to his heirs and assigns, to his and their use and behoof forever.

" In testimony whereof, I, John B. Weller, Governor of the State of California, have caused these letters to be made patent, and the seal of the State of California to be hereunto affixed.

" Given under my hand, at the city of Sacramento, this twenty-second day of June, in the year of our Lord 1859.

[L. S.]                          "JOHN B. WELLER,
                                      "Governor of State.

"Attest: FERRIS FORMAN, Secretary of State.

"Countersigned: H. A. HIGBY, Register of State Land Office.

"Recorded, June 27th, 1859."

Doll *v.* Meador.

The plaintiff then proved that the land in controversy was within the calls of the patent, and the possession of defendant Meador, and the value of the use and occupation of the land. This was all the testimony introduced by plaintiff.

Defendants proposed to the Court to prove as follows:

That the lot and parcel of land in the complaint described, is situate within the limits of the town of Red Bluff, in the county of Tehama, and State of California, and constitutes a part of the town site thereof;

That said town site was selected in the month of June, 1850, and surveyed and plotted into lots and blocks, and then actually settled upon and occupied as a town site by sundry inhabitants of the United States and of this State, for the purposes of trade, and not agriculture, and has been thence hitherto and continuously, and still is so settled upon and occupied;

That the tract of land whereon is situate the town of Red Bluff was, and every part thereof, at the date of such selection and settlement for a town, a part and parcel of the unsurveyed public lands of the United States;

That among said inhabitants, so settled upon and occupying said lands embraced by said town site, are defendants, who, by themselves and others, through whom they claim and derive possession, have occupied and peaceably enjoyed and continuously possessed the tract and parcel of land in complaint described, for purposes of residence and trade, and not agriculture, from the date of the aforesaid selection and settlement of said town to the present time;

That prior to, and on the third day of June, 1853, there were settled upon said town site of Red Bluff, embracing the tract or parcel of land in the complaint described, and in the actual occupancy of the same, for the purposes of trade, not agriculture, about fifty inhabitants, having and using at and on said town site, as many as three stores, three public houses, three mechanic shops; also, some private residences and other buildings, usual in towns;

That said town site, at the date last aforesaid, and now is, situate on the west bank of the Sacramento river, and at the head of practical navigation of the same by steamboats and other water-craft, used for the transportation of merchandise and passengers, and then was, and now is, frequented, for the purposes of trade and transportation, by steamboats, stages, large pack-trains, and other means used for the transportion of merchandise to and from said place;

Doll *v.* Meador.

That on, or before the thirty-first day of March, 1855, there were residing upon, and doing business at said town site of Red Bluff, including and embracing the lot and parcel of land in complaint described, as many as two hundred and fifty inhabitants, owning, using and occupying thereon numerous private residences, stores, warehouses, hotels, mechanic shops, saloons, restaurants and other edifices usual in towns, occupied for the purposes of trade and not agriculture ;

That at the date or dates of the location of the said town site of Red Bluff, and every part thereof, of any and all school land warrants thereon, or entries of the same in the way of purchase from the State of California by plaintiff, and patents issued thereon, from and through the said State of California, the same condition of things, as to residence upon and occupation thereof—for purposes of trade and not agriculture— then continued to exist on and at said town site of Red Bluff, as last stated, with a large increase of inhabitants, places of trade, houses and business transacted thereat.

The Court held the testimony offered to be incompetent and irrelevant; *to which defendants excepted.* Thereupon, defendants offered in evidence a certified copy of the township plot of the United States survey of the land, embracing the legal subdivision of public lands, whereon stands the town site of Red Bluff. Said plot shows a town called Red Bluff, is signed by the United States Surveyor General for California, and is dated March 31st, 1855.

The defendants next offered to prove by a " duly certified official document," that the survey offered and rejected was approved on the thirty-first of March, 1855. This was ruled out by the Court, to which defendants excepted.

The defendants then offered to show by competent proof, that there was in the custody, and on file in the office of the Register and Receiver of the Land Office of the United States of the Marysville Land District, a duly certified copy from the office of the Surveyor General of the United States for the State of California, of the same official township plot as shown by the rejected survey, at the date of the alleged location, by the State locating agent, of the land warrant, referred to in the patent of twenty-second of June, 1859, through which the plaintiff claims the lot and parcel of land in question.

This the Court excluded, and defendants took exception.

The defendants thereupon offered to prove, by competent evidence, that at no time heretofore have the United States, through any of their

Doll *v.* Meador.

official authorities, by law thereto authorized, ever issued to the State of California a patent for the legal subdivisions of the land embracing said town site of Red Bluff, and including the lot or parcel of land in the complaint described, or any part thereof; nor has the Commissioner of the General Land Office of the United States, or any other officer, by law authorized so to do, ever certified to the State of California, or to any of its agents or otherwise, any list or lists of land embracing and containing the legal subdivisions whereon the town site of Red Bluff is situate; or expressed approval of any alleged action of the State of California, had or done, whether through its Legislature or otherwise, in the selection of the said legal subdivision of land, or any part thereof, for the use and benefit of said State or its grantees, under any law or laws whatsoever.

To which offer to prove said facts plaintiff made no objection; whereupon, defendants called a witness, and asked him the following question:

" State whether or not you have made any examination in the State Land Office of the State of California, or any inquiry of the officers having the custody thereof, and also in the Land Office of the United States, at Marysville, and of the officers having the custody of the archives of said offices; and also in the office of the Surveyor General of the United States for the State of California, and of the proper officer having the custody of the archives thereof, to ascertain whether any patent from the United States to the State of California, or certified list made by the Commissioner of the General Land Office, has ever issued or been received, embracing the legal subdivisions of public land whereon is situate the town of Red Bluff; and if you have made such inquiry and search at those places, or either of them, state with what result."

This question was objected to as an improper method of proving said facts, and that the evidence offered was incompetent for such purpose. This objection was sustained by the Court, and defendants excepted.

Defendants then offered to prove by competent testimony, that they, by themselves, and those under whom they entered upon the premises in question, have always held and occupied the same and every part thereof, under a claim of right thereto, derived under the law of Congress of the United States, approved Sept. 4th, 1841; and also, the further act of the Congress of the United States, approved May 23d, 1844, as well as other laws of the United States.

This was also ruled out by the Court, under the exception of defendants.

Judgment was rendered for the plaintiff. Defendants moved for a new trial, which being denied, they appealed to this Court.

On the argument in this Court, counsel for plaintiff and respondent procured leave to file the proclamation of the President, dated June 30th, 1858, ordering the tract of land described in plaintiff's patent, as well as the lands surrounding it, to be offered for sale on the fourteenth day of February, 1859.

The following are the laws of Congress, and sections thereof, which have application to this case, and for convenient reference are herewith given:

"Act of Congress, September 4th, 1841, 'To Appropriate the Proceeds of the Sales of the Public Lands, and to Grant Preëmption Rights.'

"SEC. 8. And be it further enacted, That there shall be granted to each State specified in the first section of this act, 500,000 acres of land, for purposes of internal improvement: Provided, that to each of the said States, which has already received grants for said purposes, there is hereby granted no more than a quantity of land which shall, together with the amount such State has already received, as aforesaid, make 500,000 acres; the selections in all of the said States to be made within their limits, respectively, in such manner as the Legislatures thereof shall direct, and located in parcels conformably to sectional divisions and subdivisions, of not less than three hundred and twenty acres in any one location, on any public land, except such as is, or may be reserved from sale by any law of Congress, or proclamation of the President of the United States; which said locations may be made at any time after the lands of the United States, in said States, respectively, shall have been surveyed according to existing laws. And there shall be, and hereby is, granted to each new State that shall be hereafter admitted into the Union, upon such admission, so much land as, including such quantity as may have been granted to such State before its admission, and while under a Territorial Government, for purposes of internal improvement, as aforesaid, shall make 500,000 acres of land, to be selected and located as aforesaid.

"SEC. 10. And be it further enacted, That from and after the passage of this act, every person being the head of a family, a widow, or single man, over the age of twenty-one years, and being a citizen of the United States, or having filed his declaration of intention to become a citizen, as required by the Naturalization Laws, who, since the first

day of June, A. D. 1840, has made, or shall hereafter make, a settlement in person on the public lands to which the Indian title had been, at the time of such settlement, extinguished, and which has been, or shall have been surveyed prior thereto, and who shall inhabit and improve the same, and who has or shall erect a dwelling thereon, shall be and is hereby authorized to enter with the Register of the Land Office for the district in which such land may lie, by legal subdivisions, any number of acres, not exceeding one hundred and sixty, or a quarter section of land, to include the residence of such claimant, upon paying to the United States the minimum price of such land, subject, however, to the following limitations and exceptions: No person shall be entitled to more than one preëmptive right by virtue of this act; no person who is the proprietor of three hundred and twenty acres of land in any State or Territory of the United States, and no person who shall quit or abandon his residence on his own land to reside on the public land in the same State or Territory, shall acquire any right of preëmption under this act; no lands included in any reservation, by any treaty, law, or proclamation of the President of the United States, or reserved for salines, or for other purposes; no lands reserved for the support of schools, nor the lands acquired by either of the two last treaties with the Miami tribe of Indians in the State of Indiana, or which may be acquired of the Wyandot tribe of Indians in the State of Ohio, or other Indian reservation to which the title has been, or may be extinguished by the United States, at any time during the operation of this act; no sections of land reserved to the United States, alternate to other sections granted to any of the States for the construction of any canal, railroad, or other public improvement; no sections, or fractions of sections, included within the limits of any incorporated town; no portions of the public lands which have been selected as the site for a city or town; no parcel or lot of land actually settled and occupied for the purposes of trade, not agriculture; and no lands on which are situated any known salines, or mines, shall be liable to entry under and by virtue of the provisions of this act. And so much of the proviso of the act of twenty-second of June, 1838, or any order of the President of the United States, as directs certain reservations to be made in favor of certain claims under the treaty of Dancing Rabbit Creek, be, and the same is hereby repealed: *Provided*, that such repeal shall not affect any title to any tract of land secured in virtue of said treaty.

"Sec. 14. *And be it further enacted*, That this act shall not delay

the sale of any of the public lands of the United States beyond the time which has been, or may be, appointed by the proclamation of the President; nor shall the provisions of this act be available to any person or persons who shall fail to make the proof and payment, and file the affidavit required, before the day appointed for the commencement of the sales aforesaid."

" An Act for the Relief of the Citizens of Towns upon the Lands of the United States, under certain circumstances.

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That whenever any portion of the surveyed public lands has been, or shall be settled upon and occupied as a town site, and, therefore, not subject to entry under the existing preëmption laws, it shall be lawful in case such town or place shall be incorporated, for the corporate authorities thereof, and if not incorporated, for the Judges of the County Court for the county in which such town may be situated, to enter at the proper land office, and at the minimum price, the land so settled and occupied, in trust, for the several use and benefit of the occupants thereof, according to their respective interests; the execution of which trust, as to the disposal of the lots in such town, and the proceeds of the sales thereof, to be conducted under such rules and regulations as may be prescribed by the legislative authority of the State or Territory in which the same is situated: *Provided,* that the entry of the land intended by this act be made prior to the commencement of the public sale of the body of land in which it is included, and that the entry shall include only such land as is actually occupied by the town, and be made in conformity to the legal subdivisions of the public lands authorized by the Act of twenty-fourth of April, one thousand eight hundred and twenty, and shall not in the whole exceed three hundred and twenty acres; *And provided, also,* that any act of said trustees, not made in conformity to the rules and regulations herein alluded to, shall be void and of none effect: *And provided, also,* that the corporate authorities of the town of Weston, in the county of Platte, State of Missouri, or the County Court of Platte county in said State, shall be allowed twelve months from and after the passage of this act, to enter at the proper land office the lands upon which said town is situate.

"Act of March 3d, 1853, ' Providing for the Survey of the Public

Doll *v.* Meador.

Lands in California, the Granting of Preëmption Rights therein, and for other purposes.'

"Sec. 8. *And be it further enacted*, That the public lands, not being mineral lands, occupied as towns or villages, shall not be subdivided, or subject to sale, or to be appropriated by settlers under the provisions of this act, but the whole of such lands, whether settled upon before or after the survey of the same, shall be subject to the provisions of the act entitled 'An Act for the Relief of the Citizens of Towns upon the Lands of the United States, under certain circumstances,' approved May 23d, 1844; except such towns as are located on or near mineral lands, the inhabitants of which shall have the right of occupation and cultivation only until such time as Congress shall dispose of the same; nor shall any lands specially reserved for public uses be appropriated under the provisions of this act."

*O. C. Pratt*, for Appellants.

I.   The location of the school warrant and the patent issued to plaintiff gave him no title, inasmuch as town sites were reserved from entry and sale by the laws of Congress. (*Chotard* v. *Pope*, 12 Wheat. 655; *Jackson* v. *Wilcox*, 13 Peters, 498; *Gear* v. *United States*, 3 How. 121; Preëmption Law of September 4th, 1841; Act of May 23d, 1844; Act of March 3d. 1853.)

II.   A State location made before survey by the United States authorities is void. The eighth section of the Act of 1841 requires locations made to be conformable to the United States sectional divisions and subdivisions; and, therefore, before these divisions are marked out by survey there can be no locations made that conform to these lines.

III.   The eighth section of the Act of 1841 gave the State no present title upon her admission in the Union. (*Foley* v. *Harrison*, 15 How. 433.)

IV.   The defendants being in possession can defend that possession by showing that the patent issued for lands reserved from sale. (*Polk's Lessee* v. *Wendell*, 9 Cranch. 87; *Patterson* v. *Winn*, 11 Wheat. 380; *Stoddard* v. *Chambers*, 2 How. 284; *Summers* v. *Dickinson*, 9 Cal. 554; *Bird* v. *Lisbros*, Id. 1.)

*Geo. Cadwalader*, for Respondent.

I.   Upon the admission of California into the Union, under the eighth

section of the Act of 1841, she acquired a present and vested interest in 500,000 acres of land, over the location of which the legislative power of the State is, and was, plenary and exclusive, only circumscribed and declared non-applicable to lands reserved from sale by law, or the proclamation of the President.

1. Unlike the majority of Federal grants or concessions, the right of survey and location is not reserved, but that right, privilege or power passed with the grant and vested in the political authorities of California. Operative Congressional grants, that dispense with further action on the part of the United States authorities, are not new things in either Federal or State jurisprudence. ( *Chouteau* v. *Eckhart*, 2 How. 344.)

On the eighth of August, 1846, Congress passed a law commencing thus:

" That there be, and hereby is, granted to the State of Wisconsin, on the admission of such State into the Union, for the purpose of improving the navigation of the Fox and Wisconsin rivers, in the Territory of Wisconsin, and of constructing the canal to unite said rivers at or near the portage, a quantity of land equal to one-half of three sections in width, on each side of the said Fox river, and the lakes through which it passes, from its mouth to the point where the portage canal shall enter the same, and on each side of said canal, from one stream to the other, reserving the alternate sections to the United States; to be selected under the directions of the Governor of the State, and such selection to be approved by the President of the United States."

Construing this act, the Supreme Court of Wisconsin, in the case of *Veeder* v. *Guppy*, (3 Wis. 502) said:

"At the time of the passage of the act, (referring to a State law) none of the lands had been selected by the Governor and approved by the President, but the title of the State was as complete as it ever has been, to the certain quantity of land granted. No further act of the United States was necessary, nor was any other act ever done or performed to vest the fee in the State. The selection by the Governor, and the approval by the President, were acts of partition only, not of conveyance. They tended in no degree to enlarge the scope of or confirm the grant. The State being the owner of the land, had a right to prescribe such rules, terms and conditions to the disposal of the lands granted, not inconsistent with the terms of the grant, as it should deem proper. If the United States could convey a perfect title, the State

could take it—the title in the State is as full and complete as that of any other sovereign landholder. The grant took effect, potentially, on the admission of the State into the Union, on the twenty-ninth day of May, 1848." (*Fremont's case*, 17 How. 667 ; *United States* v. *Minnesota & N. U. R. R. Co.* Id. 1 ; *Foley* v. *Harrison*, 15 Id. 589.)

2. The provision in the eighth section of the Act of 1841, prescribing that the State locations should be made after the surveys were completed under existing laws, has no bearing upon the point under discussion, as the object and intent thereof were merely to secure locations according to the United States legal subdivisions, and preserve intact the Federal regulations concerning the same. As the location of plaintiff, in this particular, was in exact conformity with the United States subdivisions, as the patent upon its face shows, this provision is fully satisfied.

And again : When the estate of California vested on the seventh of September, 1850, no provision was made for surveys. No law having such an object was in existence ; and, therefore, to California the restriction did not apply.

3. Our location, the record shows, does conform to the United States sectional divisions and subdivisions. In the words of the eighth section of the Act of 1841, we can say that our land is located in parcels conformably to the sectional divisions and subdivisions. The State, it is true, acts at her peril before the surveys ; but, if the surveys, when made, prove the State's location was correct, the injunction of the grant, the grant itself, and the reason thereof, are satisfied.

There is nothing magical in a survey. The general preëmption law, passed in 1853, authorized preëmptions on unsurveyed lands, but provided that, when surveys were made, preëmptioners should make their locations correspond with the United States divisions. It is absurd to say that the existence of the public surveys gave the State a right of selection.

II. The fourth section of the State Act of April 16th, 1859, is constitutional, and, therefore, the patent issued thereunder vested in Doll a good and valid title in fee simple. (*Edwards* v. *Pope*, 3 Scam. 465.)

1. It is sufficient to support the validity of the fourth section, to say, that the State of California, by virtue of her right to determine a question of title between two adverse private claimants or proprietors, did not undertake to do so by legislative fiat or bull, but constituted a

tribunal, gave it jurisdiction, provided for notice of trial, insured adverse claimants a standing and a day in court, made proof of certain matters, consistent with the federal regulations, necessary to success, and a failure thereof fatal to the claimant, threw around the proceeding—" ex abundantia cautela," all the safeguards necessary to the proper determination of the question.

The question in this case was, whether the State of California's general right to have three hundred and twenty acres of land for the respondent, had particularly attached to the premises in controversy.

That issue was heard by the State Register, and decided in favor of Doll, and, of course, against all adverse claimants. The result of his determination, or sentence, was the patent, which, under the fourth section, operates as an absolute vestiture of the fee.

2. The legislation of California, in respect to the disposal of the 500,000 acres of land granted to her, has been perfectly " consistent" with the laws of Congress, federal rules and regulations, and in no particular does it conflict therewith.

Evidence that the land was not subject to Doll's location, would have obliged the State Register to reject his application. Nay, further: respondent was obliged to bring his application, by evidence, within the various provisions of the State laws, to prove himself entitled to the benefits of the fourth section of the Act of 1859.

The act did not contemplate this proceeding to be null and void, or intend that the facts upon which the patent issued should be reviewed. It was to avoid such a result that the fourth section was enacted, and the wisdom of it is made apparent by the character of this controversy.

Like a decree of a court of competent jurisdiction, this patent binds the interest of all private parties.    (3 Story, 742.)

To overthrow the fourth section, declare it void and inoperative, would seriously impair the land policy of the State, now quite comprehensive, and under which rights of great magnitude have grown up—throw a firebrand into the only class of titles regarded as secure, and virtually destroy them.

III.    The patent in this case, being valid upon its face, entitled Doll to the judgment which he obtained in the District Court.    (Sedgw. on Construction, 451 ; Bledsoe v. Wall, 4 Bibb, 328 ; 1 Munf. 134 ; Cooper v. Roberts, 18 How. 173 ; People v. Manrow, 5 Denio, 389 ; Field v. Seabury, 19 How. 323 ; Parmelee v. Oswego R. R. Co. 7 Barb. 599.)

It will be seen that the theory of the office of a patent is, that it

Doll *v.* Meador.

shall represent *quoad* the land mentioned in it, the full power of the sovereign whose act (if valid upon its face) remains so until vacated at the instance of the power which gave it birth. To this general principle some of the cases indicate a modification, by recognizing in a Court of Equity and sometimes in a Court of Law, a right in a third person superior to that of the holder of the patent, which, if established by trial, the Court of Equity, according to its principles, will not, by its decree, annul the patent, but order the patentee to convey the land therein described to the party, who, of right, is entitled to the benefit of the patent, and to whom it should have been issued. A Court of Law merely declares the title of the defendant superior to that of the holder of the patent. The authorities show cases supporting these propositions. First, " that a patent cannot be assailed, either directly or collaterally—by either the sovereign who issued it, or private persons—without the law under which it issued, or the patent itself, reserved the right of impeachment, or without its invalidity is shown upon its face." Second, that in a Court of Equity, the Government may, for good cause, procure its vacation. Third, that in a Court of Equity, a person holding a right to the land described in the patent superior to that of the patentee, may procure a decree investing himself with the title of the patentee. Fourth, in suits at law, persons holding a substantial title from the common source thereof, superior to that of the patentee, may defeat his recovery. Fifth, where the defendant is without title, he has no standing in court, and cannot question the action of the Government, or resist the patent.

IV. · The land was not reserved from sale as a town site, nor from the general right of selection in California, vested under the eighth section of the Act of 1841.

1. There is a decided difference between a reservation of land for Government purposes, and a reservation of a town site. The former, while occupied or not abandoned, is a complete reservation—a dedication which cannot be disturbed by the entries of third persons, or be wrested from the use intended by the government. This is determined by the case of *Wilcox* v. *Jackson*, (13 Pet. 498).

The latter is a contingent reservation, to become absolute when the town authorities, in the manner prescribed by the law of May 23d, 1844, enter and pay for the land which constitutes the town site.

A special limit is fixed, within which the right must be exercised—

that is, before the commencement of the land sale—that period pass-
ing, the right to enter the land is lost to the town authorities, gone
forever—and with it, the reservation.  This municipal preëmption law
guarantees to the inhabitants of towns a right of entry before the lands
have been offered for sale.  It is easy to see that the reservation is for
one purpose, and but one—to make town authorities preferred pre-
ëmptioners, upon the condition that they accept the privilege before the
land around the town site is sold.  The act that creates the privilege,
fixes a period for its determination, after which the land is subject to
entry by the State, or sale, as part of the public domain.  (Opinion of
Attorney General Gilpin, of July 25th, 1840; *U. S.* v. *R. R. Bridge Co.*
6 McLean Reports.)

2. The time for their entry passing, town sites are no longer con-
tingent reservations; no longer subject to the Act of May 23d, 1844;
(or what must be regarded as a part thereof, the eighth section of the
Act of March 3d, 1853) no longer reserved from sale or entry, and
they may be disposed of without a special act of Congress; and the
State of California is not inhibited from taking up such vacant places,
as public lands of the United States.

The design of Congress was, and the reason upon which the laws of
1844 and 1853 is based, is, for a certain length of time, to give town
authorities a preferred right of entry up to a certain time to take up so
much of the public lands as may be occupied by the inhabitants of the
town, and no more; the quantity is limited, and also the time within
which the right must be exercised.

This right cannot be said to be continuing; cannot be said to curtail
the revenue of the government—to withdraw the land from sale or
entry by the State.  Congress merely says to the municipal authorities,
as you are occupying our land and we contemplate selling it soon at one
dollar and twenty-five cents per acre, you may at any time before we
sell the public land around it, that is, if you see proper, pay the
standard price and take it.  A mere proposition, not a contract, until
the offer is accepted and the price paid; to this condition the eighth
section of the Act of March 3d, 1853, subjects town sites.  Neither
act confers either a legal or equitable right in the inhabitants; it is after
the land is entered that their occupation gives them a right and makes
them the beneficiaries of a trust.

To test this we ask the question, Has not Congress a most undoubted
right to repeal the Act of May 23d, 1844, any time before the land is

Doll *v.* Meador.

entered and the purchase money thereof paid? Undoubtedly. But when the land is purchased, Congress is powerless to accomplish the destruction of such a vested right. This illustrates, forcibly, the weak *status* of appellants.

Until the land is entered in the manner provided by the Act of May 23d, 1844, the occupant has no title; not even what the appellant dignifies, in his offered testimony, with the appellation of a "claim of right." (*United States* v. *Brown,* 4 McLean, 378.)

By the survey appearing in the record dated March 31st, 1855, the site of "Red Bluff" is represented thereon. Yet we find the President of the United States ordering the identical tract of land described in the patent, to be sold to the highest bidder, on the fourteenth of February, 1859. This, of itself, ignores the idea of a reservation.

V. The President's proclamations, ordering public land sales, are judicially noticed. (Report of N. Y. Commissioner, secs. 1705, 1706; 1 Greenl. Ev. 8; 2 Green, Iowa, 191.)

*S. Heydenfeldt and E. B. Crocker,* also for the Respondent.

I. The patent, in this case, vested in the plaintiff "a good and valid title, in fee simple, to the lands therein described." Such is the language of the act under which this patent issued.

The Act of Congress of 1841 operated as a present grant to the State the moment the selection was made, without any patent from the United States. (*Foley* v. *Harrison,* 15 How. 433; *Wilcox* v. *Jackson,* 13 Pet. 498; *Summers* v. *Dickinson,* 9 Cal. 554; Opinions U. S. Attorney General, 8 vol. 247, 253, 254, 390.)

In pursuance of that act, this State has passed various laws, providing for the selection of these lands; and under these laws, the lands described in the plaintiff's patent were selected. But it is insisted that these lands were reserved from sale, and consequently from selection, and to sustain this, the defendants' counsel refers to the Acts of Congress of 1841, of 1844 and of 1853.

But a careful examination of these acts shows that they do not reserve town sites from sale, within the exception of the Donation Act, but merely reserve them from entry under the preëmption laws, until the commencement of the public sale of the body of the land in which they are situated.

II. The defendants, being destitute of title, have no right to attack the patent.

1. Settlers upon public land have no title; at least, not until they have done some act towards its purchase or preëmption. (*Burgess* v. *Gray*, 16 How. 48, 65; *Merrill* v. *Le Grand*, 1 How. (Miss.) 150; *Craig* v. *Tappan*, 2 Sandf. Ch. 78; 8 S. & M. 234, 268; *Wynn* v. *Morris*, 20 How. 3-6; *United States* v. *Brown*, 4 McLean, 378.)

2. Without some title, defendants had no right to attack the patent, and the District Court, therefore, did not err in ruling out the proof. (*Moore* v. *Wilkinson*, 13 Cal. 478; *Boggs* v. *Merced M. Co.* 14 Id. 279; *Yount* v. *Howell*, Id. 465.)

And this principle is fully sustained by the following cases: *Bagnell* v. *Broderick*, 13 Peters, 450; *Burgess* v. *Gray*, 16 How. 48; *Minter* v. *Crommelin*, 18 Id. 87; *Cooper* v. *Roberts*, 18 Id. 173, 182; *Spencer* v. *Lapsley*, 20 Id. 273; 7 Barb. 621; *Jackson* v. *Lawton*, 10 Johns. 23; *Wiggins* v. *Lusk*, 12 Ill. 132; *Brewer* v. *Manlove*, 1 Scam. 156; *Crommelin* v. *Minter*, 9 Ala. 594; *Boyce* v. *Papin*, 11 Miss. 16.

3. A patent cannot be impeached in a collateral action, for any matter *dehors*, but only in a direct action brought by the Government for that purpose, in equity, by *scire facias* or information. (*Yount* v. *Howell*, and *Moore* v. *Wilkinson*, cited supra; *Gregory* v. *McPherson*, 13 Cal. 562; *White* v. *Burnley*, 20 How. 247; *Spencer* v. *Lapsley*, 20 Id. 272; *Field* v. *Seabury*, 19 Id. 332; *Cooper* v. *Roberts*, 18 Id. 173; 3 Pet. 320; 7 Wheat. 212, 120; 13 Pet. 449; 5 Wheat. 293; 6 Cow. 281; 4 Bibb, 329; 7 Barb. 621; 4 Monroe, 51; 6 Md. 104; 2 Ohio, (N. S.) 216; 15 Geo. 491; 10 Id. 465; 7 B. Monroe, 80.)

III.   The locations could be made before the survey of the United States.   The Act of 1841 requires the locations to be made "conformably to sectional divisions and subdivisions."   "Conformably to," means in like manner, or method.   It does not require them to await a survey by the United States.   It no where says so.   On the contrary, it says, "shall be located in parcels conformably to," &c.   If it had intended otherwise, the act would have said, "shall be located in sectional divisions, as made by the United States survey."   The Legislature has provided that, after the United States survey, the lines of the locations shall be made to conform to the lines of such survey.   The idea of subsequently shifting, swinging or conforming lines of a survey to a subsequent survey, is not a new one in that act.

It is exactly the plan required in the Act of Congress, providing for preëmptions on unsurveyed lands.

It is submitted, that certainty is all that is aimed at by the Act of

Doll v. Meador.

Congress, and if that can be equally attained by a plan of selection prior to the survey, there is nothing in the policy of the Government, nor in a just interpretation of the act, which would operate to delay the selections to be made by the State, until after a survey. Probably four-fifths of the lands derived under the Act of 1841, have been selected in the same manner; and no complaint has ever arisen on the part of the United States, of want of conformity to her plans of survey, or of any embarrassment arising from the State's action.

IV.   The location of lands belongs to the political department of Government, and the acts of public officers therein cannot be attacked in a collateral action, especially in a case like this, where the law provides for the trial of contests before the Register of the State Land Office and the District Courts, prior to the issuing of the patent.   In such case, the decision of the Register is res judicata.

It would impose a great hardship upon holders of title under a patent, if in every little petty action of ejectment—perhaps for land of little present value—the defendant could compel them to prove every pre-requisite on which the patent is founded.   The State has especially provided how the matter may be contested once for all, and thus evidently intended to relieve the patentee from such a burden—if it could be imposed upon him under the rules of law.

Where the law has referred the decision of a matter to the sound discretion of a public officer, upon the facts of which he is the appropriate judge, his adjudication becomes conclusive.   (Allen v. Blunt, 3 Story, 742.)

The decision of land officers, in respect to the right of preëmption, is conclusive.   (16 Ark. 25 ; 14 Ill. 343 ; 13 Ala. 137 ; 9 Mis. 183 ; 16 How. 64.)   The certificate of the surveyor, authorized by law to locate lands, is sufficient proof as to the performance of all the acts required by law; and the parties cannot go behind it.   (5 Cranch, 234; 3 Wheat. 594; Haydel v. Dufresne, 17 How. 23.)

Congress appropriated a certain quantity of lands for schools, to be selected by the Secretary of the Treasury, out of any unappropriated public land.   Held, that the selection by the Secretary is conclusive. (Campbell v. Township No. 1, &c. 12 How. 244.)

FIELD, C. J. delivered the opinion of the Court—BALDWIN, J. and COPE, J. concurring.

21

This is an action of ejectment for the possession of a lot situated in the town of Red Bluff, in the county of Tehama. The plaintiff relies for recovery upon a patent of the State of California, embracing the premises in controversy, issued to him upon a location of three hundred and twenty acres of land, of the 500,000 acres granted to the State by the Act of Congress of September 4th, 1841. The defendant Meador rests his defense upon the alleged selection of the three hundred and twenty acres as the town site of Red Bluff, and its consequent reservation, by the terms of the Act of Congress, from location by the State as a part of the land granted to her. The other defendants are tenants under Meador.

The Act of Congress of September 4th, 1841, is entitled "An Act to Appropriate the Proceeds of the Sales of the Public Lands, and to Grant Preëmption Rights;" and in its first section specifies by name several States to which ten per cent. of the net proceeds of the sales of the public lands—made after a certain date within their limits—is to be paid. Its eighth section is as follows: " There shall be granted to each State specified in the first section of this act, 500,000 acres of land, for purposes of internal improvement; provided, that to each of the said States which has already received grants for said purposes, there is hereby granted no more than a quantity of land which shall, together with the amount such State has already received as aforesaid, make 500,000 acres; the selections in all of the said States to be made within their limits respectively, in such manner as the Legislatures thereof shall direct, and located in parcels, conformably to sectional divisions and subdivisions, of not less than three hundred and twenty acres, in any one location on any public land, except such as is or may be reserved from sale by any law of Congress or proclamation of the President of the United States; which said locations may be made at any time after the lands of the United States, in said States respectively, shall have been surveyed according to existing laws. And there shall be, and hereby is granted to each new State that shall be hereafter admitted into the Union, upon such admission, so much land as, including such quantity as may have been granted to such State before its admission and while under a Territorial Government, for purposes of internal improvement, as aforesaid, shall make 500,000 acres of land, to be selected and located as aforesaid."

The words of the first clause of this section were held by the Supreme Court of the United States, in *Foley* v. *Harrison* (15 How. 447) inop-

Doll *v.* Meador.

erative to pass the fee from the General Government.    " The words of
the Act of 1841," said the Court, " are, that ' there shall be granted to
each State,' not that there is hereby granted.    The words import that
a grant shall be made in future."    The last clause of the act, with ref-
erence to the new States, is materially different.    Its words are, " there
shall be, and *hereby is granted*"—words which operate to vest the specific
quantity in each new State, immediately upon its admission into the
Union.    Under it, upon her admission, California acquired a present
and vested interest in the quantity designated; with a right to select
and locate the same, in such manner as her Legislature might direct,
out of any of the public lands of the United States, except such as were
or might be reserved from sale by any law of Congress, or the procla-
mation of the President.    It is to be observed, that with reference to
the States referred to in the first section of the act, the selections and
locations are to be made *after* the lands of the United States in those
States respectively have been surveyed according to the existing laws.
But with reference to the new States, the *time* of the selection and loca-
tion is not designated.    The concluding words of the grant to them—
providing that the land is " to be selected and located as aforesaid "—
refer, as we conceive, only to the manner and form of the selection, and
the quantity which the several parcels must embrace.    Conformity in
the locations with the sectional divisions and subdivisions is required,
to preserve intact the general system of surveys adopted by the Federal
Government, and to prevent the inconvenience which would ensue from
any departure therefrom.    When, therefore, any location is made by the
State, previous to the survey of the United States, it must be subject to
change, if, subsequently, upon the survey being made, it be found to want
conformity with the lines of such survey.    With this qualification, and
the further qualification of a possible reservation by a law of Congress,
or a proclamation of the President, previous to the survey—which may
require further change, or the entire removal of the location—we do not
perceive, either in the language of the act, or the object to be secured,
any limitation upon the right of the State to proceed at once to take
possession and dispose of the quantity to which she is entitled by the
grant.    It would hardly be pretended, that she would be deprived of
the bounty of the General Government, if no surveys were ever directed
by its authority, or that the enjoyment of the estate vested in her would
be suspended indefinitely, by reason of its inaction in the matter.

The legislation of the State has proceeded upon a construction of

the Act of Congress similar to that which we have given, and under it interests of great magnitude have grown up, any disturbance of which would lead to consequences greatly to be regretted. Surveys of the public lands in California were not directed by any law of Congress, until the year 1853, and yet, on the third of May, 1852, the Legislature passed an act providing for the sale of the 500,000 acres granted to her. This act authorizes the Governor to issue land warrants for not less than one hundred and sixty, and not more than three hundred and twenty acres, in one warrant, to the amount of the 500,000 acres, and the Treasurer to sell them at two dollars per acre, and the purchasers and their assigns to locate them, on behalf of the State, " upon any vacant and unappropriated lands belonging to the United States within the State of California, subject to such location," but declaring that " no such location shall be made except in conformity to the law of Congress, which law provides that not less than three hundred and twenty acres shall be located in a body." The fifth section provides that the location " shall secure to the purchaser the right of possession to the land" until the Government survey, after which the lines of the location shall be made to conform to the lines of sections, quarter sections, and fractional sections, of such survey. The seventh section provides that if the location be made upon lands which prove not to be lands of the United States, the party owning the warrants may float them upon other public lands in the State. The fourteenth section provides that, so soon as the lands located under the act shall have been surveyed by the United States, and the locations made to conform to the Government survey, the Governor shall cause patents to be issued, in such manner and form as the Legislature may prescribe.

A disposition, on the part of the State, to conform to the requirements of the Act of Congress is apparent in the provisions of this statute. The location is authorized only upon vacant and unappropriated lands, subject to such location; it is to be made in parcels, as required by the law of Congress; it is to conform to the lines of the Government survey, when that is made, and the patent of the State is not to issue until such conformity is had.

On the thirtieth of April, 1857, the Legislature passed an act in relation to the location of the warrants issued under the act of 1852, and the issuance of patents for the lands located thereunder. It is entitled " An Act Authorizing the Location and Patenting of School Lands," and its first section provides that in all cases where the lands of

Doll *v.* Meador.

the United States have been duly surveyed by the General Government, and the plat thereof has been on file thirty days at the Land Office of the proper district, it shall be lawful for the owners of warrants, issued under the act of 1852, to locate the same according to the legal sub-divisions of the public lands, by filing a written application, specifically describing the tract located, with the Register of the United States Land Office of the proper district, accompanied with the affidavit of the parties, and of one or more witnesses, that there is no valid claim existing upon the land adverse to the claim of the applicants. (Session Laws of 1857, Ch. 260.)

On the tenth of April, 1858, the Legislature passed an act creating a " State Land Office for the State of California," and designating its chief officer as " the Register of the State Land Office," and constitut-ing the Surveyor General, *ex-officio*, such Register, until otherwise provided. (Session Laws of 1858, Ch. 176.) This act prescribes, with much particularity, the duties of the Register; and among them is that of keeping a record of all lands selected by the agents of the State as a portion of the 500,000 acres, showing the number of acres, the description of the land, by range, township and section, the name of the original purchaser, and of the selecting and locating agent, the price per acre, and the number of the school land warrant under which the same is located.

On the twenty-third of April, 1858, the Legislature passed an act providing for the location and sale of the unsold portion of the 500,000 acres, and the seventy-two sections donated for the use of a seminary of learning. (Session Laws of 1858, Ch. 279.) By this act, the Gov-ernor is authorized to appoint and commission, in each of the United States Land Districts of the State, a locating agent, whose duty it is made to locate the unsold school lands, and the seminary lands referred to, in the manner provided by the act. The agents are required to proceed and obtain the consent of such settlers as may choose to avail themselves of the benefits of the act, and the request of others, who are not settlers, who may wish to purchase lands under its provisions—such consent or request to be accompanied with the affidavit of the parties, and of two disinterested persons, that there is no valid claim existing upon the land desired adverse to their own; and when such consent or request is obtained under such forms as the Governor may prescribe to apply to the Register and Receiver of their respective land offices, to permit the location to be made in the name of the State,

as a part of the land above designated, and if permitted, to make the location in conformity with the laws and regulations of the United States. The sixth section confers upon the parties whose lands have been thus located, the right to a certificate of purchase for the same, upon paying one dollar and twenty-five cents per acre, and interest at the rate of ten per cent. per annum, from the date of the location in the United States Land Office; or, if the purchaser prefer, upon paying twenty per cent. of the purchase money and one year's interest upon the balance in advance—the Legislature reserving the right to require the payment of the balance after a certain period; and the purchaser forfeiting the money paid and all claim to the land, upon failure to pay the interest prescribed, or the balance due, when thus required by any law of the State. The twelfth section repeals the Act of May 3d, 1852, but declares that all school land warrants then in circulation shall be received for school lands, and may be located as then provided by law.

On the sixteenth of April, 1859, the Legislature passed an act for the issuance of patents to lands located under school warrants, and for lands purchased under the Act of April 23d, 1858. (Session Laws of 1859, Ch. 338.) This act provides that in all cases where school land warrants have been issued under the Act of May, 1852, and the same have been, or may be, located upon any of the public lands of this State, subject to such location, and in accordance with its provisions, or with the provisions of the Act of April 30th, 1857, or where parties have purchased under the Act of April 23d, 1858, and obtained a certificate of purchase from the Register of the State Land Office, the holder of such warrant or certificate of purchase shall be entitled to receive a patent from the State for the lands thus located or purchased. The second, third and fourth sections of the act are as follows:

"SECTION 2. The holder of a warrant or certificate of purchase desiring a patent, shall be required to produce to the Register of the State Land Office proper evidence to show: First, that such warrant has been located in conformity with the provisions of the act under which the same purports to have been located. Second, that the lands have been duly surveyed by authority of the United States Government, and the plats of such survey have been approved by the Surveyor General, and that the location conforms to such survey. Third, that the location of such warrant has been made or filed in the United States Land Office for the district in which the land is

situated, and the location made with the consent of the Register and Receiver of such Land Office, and at least ninety days have elapsed since said location, or if said applicant holds a certificate of purchase, he shall prove to said Register that the lands have been purchased in accordance with the Act of the twenty-third of April, 1858, and that the purchase money and all interest due thereon has been fully paid, and that notice of such application has been made by publication in a public newspaper published within the county in which such lands are situated, for at least four weeks next preceding such application, or if no newspaper is so published, then by written notices posted in two conspicuous places on the lands so applied for, and one on the court house door of the county; and upon such proof of the foregoing facts, all persons holding adversely may be entitled to appear before the Register and contest the application for such patent.    This section shall be construed to authorize and permit purchasers to pay in cash for lands purchased under the Act of the twenty-third of April, 1858.

SEC. 3.    Upon the production of the evidence required in section two of this act, the Register of the State Land Office shall issue to the applicant his certificate of the proper location of such warrant upon the tract or tracts of land described in such location, or, if the holder of a certificate of purchase, that all the principal and interest due thereon has been paid, and that the applicant is entitled to receive a patent for the lands described in the location of said warrant, or in said certificate of purchase; but no such certificate shall issue, until the warrant or certificate of purchase upon which the same is to be issued shall be surrendered to said Register.

" SEC. 4.    Upon the production of the certificate of the Register of the State Land Office, as provided in section three of this act, the Governor of the State shall issue a patent to the purchaser entitled thereto, for the lands described in said certificate, which shall be signed by him and countersigned by the Register of the State Land Office, and he shall affix the seal of his office thereto; such patent shall vest in the grantee therein named a good and valid title, in fee simple, to the lands therein described."

The patent issued to the plaintiff refers to the Act of Congress of September 4th, 1841, and the Acts of the State of May 3d, 1852; of April 30th, 1857; of April 23d, 1858; and of April 16th, 1859, and recites that it appears by the certificate of the Register of the State Land Office, issued in accordance with the provisions of the last act,

bearing date of the fourth of June, 1859, that the tracts of land described in the patent have been duly located in accordance with the said laws of the State, and that the plaintiff is entitled to receive a patent therefor, and is signed by the Governor, attested by the Secretary of State, and countersigned by the Register of the State Land Office, with his seal of office affixed, and bears the seal of the State.  It is dated on the twenty-second of June, 1859, and purports to grant, in the name of the State, the lands described therein to the plaintiff and to his heirs and assigns forever.  It embraces two hundred and ninety-six acres and seventy-seven one-hundredths of an acre, the same being accepted in lieu of the three hundred and twenty acres, the balance of the quantity of the entire parcel being relinquished by the State, or reserved by her from grant to the plaintiff.  It is under this patent that the plaintiff claims title to the premises in controversy; and it is clear that if the tract embracing them were subject to location as part of the five hundred thousand acres, that is, were not reserved from sale by any law of Congress or the proclamation of the President, his claim is good, and a valid title is vested in him.  In nearly all the cases where locations of portions of the lands granted by the Act of September 4th, 1841, have been made under the laws of the State, no such reservation has existed, or proclamation been made, and the patentees have in consequence acquired a valid title in fee simple to the lands included in their respective patents.  The grant from the General Government took effect, as we have already stated, upon the admission of California, conveying to her, not, it is true, a title to any specific land, but a present and immediate interest in the designated quantity to be afterwards located under the direction of her Legislature, with no restriction upon her power, except as to the form and quantity of the several parcels to be selected and located.  When the selection and location are once made, pursuant to her directions, of lands not reserved, but subject to location, the general gift of the quantity becomes a particular gift of the specific lands located, vesting in her a perfect and absolute title to the same; and that title passes by her patent.  (See *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196; *Fremont* v. *The United States*, 17 How. 542; *Veeder* v. *Guppy*, 3 Wis. 522.)

In the present case, the defense rests upon the alleged reservation of the tract embraced in the patent to the plaintiff, from location by the State, as part of the land granted to her, on the ground of its previous selection as a town site.  On the trial, the defendant offered to prove

various facts showing its selection and survey into blocks and lots, and its settlement and occupation by citizens of the United States and of this State, as early as June, 1850, and its continued use and occupation by them as a town site, and for the purposes of trade, and not agriculture, ever since; and the possession and use of the lot in controversy by the defendants, or parties through whom they claim, for the like purposes, continuously since the original selection; also, that the tract was first officially surveyed, and the survey thereof approved under the laws of the United States, and by their proper officers, on the thirty-first of March, 1855; that the tract was then designated as such town site on the official plot of the survey; that a certified copy of the plot was on file in the office of the Receiver and Register of the United States Land Office at Marysville, at the time of the location referred to in the patent to the plaintiff, and that no patent from the United States for the tract, or certified list embracing the same, made by the Commissioner of the General Land Office of the United States, has ever been issued to the State. The proof offered, except as to the issuance of a patent by the United States, or a certified list by the Commissioner of the General Land Office was, under the objection of the plaintiff, excluded, and as to the patent and certified list, the proof was held incompetent, and it is upon exceptions taken to the rulings in these respects that the defendants seek a reversal of the judgment.

The general argument of the counsel of the plaintiff, in support of the judgment of the Court below, has been directed to establish two propositions:—1st. That the tract embraced in the patent to the plaintiff, though constituting a town site, was not thereby reserved from selection by the State as part of the grant to her, nor from location by the plaintiff by her authority; and 2d. That the relation of the defendants to the title is not such as to allow them to question the validity and efficacy of the patent.

We are of opinion that both of these propositions can be maintained, and clearly so with reference to the last. The tenth section of the Act of September 4th, 1841, authorizes the entry, by individuals, in certain cases, of portions of the public lands, upon paying the *minimum* price of the same to the United States; in other words, confers preëmptive rights or privileges, upon compliance with certain conditions. This right or privilege is subject, however, to express exceptions, and among others, the section declares, that "no portions of the public lands which have been selected as the site for a city or town," and "no parcel or lot

of land actually settled and occupied for the purposes of trade, and not agriculture," shall be liable to entry under and by virtue of the provisions of the act. There is, in this act, no reservation of the lands selected as a town site, or of the parcels or lot occupied for purposes of trade, from sale in the ordinary mode in which the general mass of the public lands is sold; they are only excepted from preëmption—that is, from sale at the lowest Government price, upon the entry of the settler.

The Act of May 23d, 1844, "for the Relief of the Citizens of Towns upon the Lands of the United States, under certain circumstances," extends the preëmptive right or privilege to town lands—the same to be asserted by the authorities of incorporated towns, or by Judges of the County Courts of the counties embracing the lands, where the towns are not incorporated. It enacts as follows: "That whenever any portion of the surveyed public lands has been, or shall be, settled upon and occupied as a town site, and, therefore, not subject to entry under the existing preëmption laws, it shall be lawful, in case such town or place shall be incorporated, for the corporate authorities thereof, and if not incorporated, for the Judges of the County Court for the county in which such town may be situated, to enter, at the proper land office, and at the minimum price, the land so settled and occupied, in trust, for the several use and benefit of the occupants thereof, according to their respective interests; the execution of which trust, as to the disposal of the lots in such town, and the proceeds of the sales thereof, to be conducted under such rules and regulations as may be prescribed by the Legislative authority of the State or Territory in which the same is situated; provided, that the entry of the land intended by this act be made prior to the commencement of the public sale of the body of land in which it is included, and that the entry shall include only such land as is actually occupied by the town, and be made in conformity to the legal subdivisions of the public lands, authorized by the act of the twenty-fourth of April, 1820, and shall not, in the whole, exceed three hundred and twenty acres; and provided, also, that any act of said trustees not made in conformity to the rules and regulations herein alluded to, shall be void and of no effect." In this act, also, there is no reservation of the town lands from sale. On the contrary, the act proceeds on the ground that they are to be sold, and confers the privilege of taking them, for the benefit of their occupants, at the lowest Government price. It confers the privilege of preëmption, to be asserted at any time preceding the commencement of the public sale of

the body of the land in which the town is situated.  If the privilege be not thus asserted, it is gone, and the land falls into the general mass of public lands which is offered for sale.

The Act of March 3d, 1853, providing "for the Survey of the Public Lands in California, the Granting of Preëmption Rights therein, and for other purposes," places the public lands in this State, with certain specified exceptions, "subject to the preëmption laws of September 4th, 1841, with all the exceptions, conditions, and limitations therein," and provides for the sale of the same.  Its eighth section declares, that the public lands, not being mineral lands, occupied as towns or villages, shall *not be subject to sale under the provisions of the act,* but that the whole of such lands, whether settled upon before or after the survey of the same, shall be subject to the provisions of the Act of May 23d, 1844, except such towns as are located on or near mineral lands, the inhabitants of which shall have the right of occupation and cultivation only until such time as Congress shall dispose of the same.  There is, in this act, a reservation of the town lands from sale under its provisions, but at the same time, these lands are subjected to the provisions of the Act of May 23d, 1844, which, as we have seen, authorizes a sale at the lowest government price—that is, confers a right upon the corporate authorities, or County Judges, to take them for the benefit of the inhabitants of the towns, on those terms, up to the commencement of the public sale of the body of the land in which the towns are included; after which, such lands are offered, with the general mass, to the public.  It was not the intention of Congress to preserve the lands forever from sale, if no entry by the corporate authorities, or County Judges, were made.  There was not, then, we think, any such reservation, "by any law of Congress," as to preclude a selection of the tract patented to the plaintiff by the State, as part of the grant to her.  Nor has there been any proclamation by the President, making such reservation, and thereby precluding such selection.  Nor is there anything in the policy of the General Government, as to the disposition of the public lands occupied as towns and villages, which would necessarily be defeated by allowing their selection.  That policy is to afford protection to the inhabitants of these towns in the occupation and improvement of the lots and parcels upon which they have settled.  It is not to withdraw the lands from sale, but to confer the privilege of purchase, at the lowest Government price, for the benefit of the inhabitants, before the public sale commences.  It cannot be presumed that

the sovereign State of California will be less mindful of the interests and welfare of her citizens than the General Government, and that she will permit her right of selection to be made the instrument of oppression and injustice to them.   There is nothing in her legislation, with reference to these 500,000 acres donated to her, which sanctions, in the slightest degree, any inference to that effect.   On the contrary, her legislation on the subject has been eminently beneficent and just.   In the first act passed—that of May 3d, 1852—she declared it to be unlawful to locate any of the warrants issued by her upon land within the limits of any town then surveyed or laid off.   That provision remained in force until the twenty-third of April, 1858, and during the period intervening the passage of the Act of Congress of March 3d, 1853, and the period fixed by the proclamation of the President, February 14th, 1859, for the commencement of the public sale of the body of the land, including the town of Red Bluff, it does not appear that any proceedings were taken to secure, for the benefit of its inhabitants, the proffered privilege of preëmption, or that any such proceedings have been taken since.

But if we are mistaken in the views we have expressed of the legislation of Congress, we are clear that the defendants are not in a position to question, in this action of ejectment, the validity and efficacy of the patent to the plaintiff.   The patent, as against them, is conclusive of the regularity and validity of the action of all the officers of the State in the selection of the lands donated by the General Government. It is the record of the State that the land was subject to location under the grant of the United States, and has been located through her officers in pursuance of the terms of the donation, and as against parties who have no higher right than that which arises from mere occupation, it imports absolute verity.   We admit that there are limitations upon the conclusiveness of this record, and that under some circumstances its operation in vesting an estate may be questioned collaterally.   We admit, in general terms, the correctness of the doctrine declared in *Patterson* v. *Winn* (11 Wheat. 380) to be the settled doctrine of the Supreme Court of the United States, that if a patent be absolutely void upon its face, or were issued without authority, or were prohibited by statute, or the State had no title, it may be impeached collaterally in an action of ejectment.   We admit, we say, this doctrine in general terms, for there are many qualifications to be considered in its application.   If the patent be void upon its face, it may be assailed at any time and in

Doll *v.* Meador.

all cases, for it is itself record evidence of the matter which renders it
a nullity. *(Bledsoe's Devisees* v. *Well,* 4 Bibb, 329.)   If it be issued
in the absence of legislation directing a disposition of the property
described, or by an officer who is not invested with power to sign the
same, or for an estate prohibited, its validity may also be controverted in
any action, either directly or collaterally; but if the authority to issue
the patent depend upon the existence of particular facts in reference to
the condition or location of the property, or the performance of certain
antecedent acts, and officers have been appointed for the ascertainment
of these matters in advance, who have passed upon them and given
their judgment—then the patent, though the judgment of the officers be
in fact erroneous, cannot be attacked collaterally by parties showing
title subsequently from the same source, much less by those who show
no color of title in themselves.  In such cases, the parties without title
cannot be heard at all, and the parties with subsequent title must seek
their remedy by *scire facias,* or bill, or information to revoke the first
patent or limit its operation.   But upon questions of this latter charac-
ter it is unnecessary to express any opinion, and we allude to the matter
to prevent any misapprehension of our language in reference to the
position of the defendants in the present case.   If the doctrine declared
in *Patterson* v. *Winn* be admitted without qualification, it does not meet
the question in the present case.   The question here relates to the *status*
of the parties who are permitted to assail the patent, on the ground that
the land upon which Red Bluff is situated was not subject to location
as part of the land granted to the State.   Can any one who has no
other relation to the property sought to be recovered than that of mere
possession, take the position of assailant upon that ground?   The patent
here under consideration is regular and valid upon its face, and it is
only upon proof *dehors* the instrument that any basis for its attack can
be in the first instance laid.   The United States say in effect to the
State of California, We donate to you a certain quantity of land to be
located under the direction of your Legislature.   To obtain the benefits
of this bounty, the State, through her Legislature, provides for the
selection in good faith, with numerous checks against the abuse of the
power, right or privilege vested in her.   She makes the selection.   Who
can complain that she has abused the power, or right, or privilege, what-
ever it may be termed, with which, in confidence in her good faith, she
has been trusted?   Certainly, none but the donor of the power, or right,

Doll *v.* Meador.

or privilege, or parties clothed with a position to represent the donor as to the property by an investiture of the title or some claim of title.

The defendants in the present case stand in no privity with the United States, and possess no claim, legal or equitable, to the lands upon which they are settled. The proffered offer of the general government to invest them with a title, though the action of certain officers, has never been accepted, though years have passed with the offer pending before them. The offer is therefore withdrawn, and their position is like that of any others who occupy without right. They are strangers henceforth to the title, and must continue such strangers until further action by the Government on their behalf. That Government, after years of delay, has, through its Receiver and Register of the appropriate Land Office, taken a receipt for the land as a part of the grant to the State, and the State has received from the plaintiff the consideration for the same, and issued her patent. The object of the patent is to give security and quiet to its holder, as to the title of the property which it purports to transfer to him; but such patent would be anything but an instrument of security and repose, if every one not in privity with the original owner of the title, but simply hoping that by some future action of the Government he may possibly possess some interest in the property, could compel the patentee in every instance in which he may seek the aid of the legal tribunals, to establish the validity and regularity of the action of the officers of the State in the selection, or approval of the selection of the land, and in the issuance of the patent. Such is not the law, and in no case which we have been able to find in the wide range of American jurisprudence, has it ever been held to be the law. On almost every subject of judicial investigation, we find some differences of opinion; often, it is true, of a very slight character, in the adjudications of the different tribunals of the several States; but upon this proposition, that a person without title from a common or paramount source cannot attack and overturn, in an action of ejectment, a patent which is regular upon its face, there is no difference of opinion, except, perhaps, that which may be inferred from a case in our own Court, which we will hereafter consider.

In *Bledsoe's Devisees* v. *Well* (4 Bibb, 329) a patent from the Commonwealth was produced by the plaintiff, bearing date on the eighteenth of May, 1802, and purporting to have been issued in consideration of two treasury warrants. The defendant, to invalidate the patent, offered to prove that the land lay south of the line which formed the boundary

Doll *v.* Meador.

of the tract of country reserved for the officers and soldiers of Virginia who had served in the revolutionary war.    The act of 1789, authorizing the issuance and location of treasury warrants, expressly prohibited their location within the reserved tract until the further order of the Legislature.    The question presented was as to the admissibility of the evidence offered.    The Court held the evidence inadmissible.    " We are not aware," said the Court, " of any order or act of the Legislature which has since authorized the appropriation of land by virtue of a treasury warrant within that tract of country.    It would seem, therefore, necessarily to result, that a patent in consideration of a treasury warrant could not be legally granted for such land; and if it had appeared upon the face of the patent, in this case, that it had issued for land within that tract of country, we would have had no doubt that it was void; but we are not of opinion that parol evidence of a fact *dehors* the patent was admissible in this case, for the purpose of avoiding or defeating the patent; for although a patent, when it appears on its face to be illegal, may be considered void and treated as a nullity, yet, if it appear perfect on its face, it cannot be vacated by matter *dehors* the patent, but by *scire facias*, or other regular mode of proceeding, instituted for the purpose of vacating it.    The reason of this distinction is evident.    The Commonwealth cannot be regularly divested of her title but by matter of record, and when she has so divested herself, she cannot regularly reinvest herself of the title but by matter of record.

" If, therefore, the patent be illegal upon its face, it is itself record evidence of the matter which renders it a nullity; but if it be legal and perfect upon its face, it is a record of the title having passed to the grantee, and it cannot regularly be defeated but by matter of as high a nature.

" This doctrine was explicitly recognized by the opinions of the Judges of the Court of Appeals of Virginia, in the case of *Alexander* v. *Greenup*, (1 Munford, 134) and seems to be fully supported by the English authorities."

In this case, if the defendant had himself, previously, received from the Commonwealth, a patent to the reserved tract under an order of the Legislature, he would have been in a position to attack the patent to the plaintiff, either in an action of ejectment brought by or against him, or, if in possession, by a bill in equity to quiet his title; but as it would appear he was without title himself, he was in no position to assail the record of the Government.

In *Parmelee et al.* v. *Oswego and Syracuse Railroad Co.* (7 Barb. 621) the plaintiffs claimed the right to the possession of the premises in controversy under certain resolutions of the Commissioners of the Land Office of New York, setting the premises apart to their assignors for particular purposes, provided certain conditions were complied with. The defendants claimed title under a patent of the State, and this patent, it was contended, was void. The Court held, that if void, its want of validity could not be set up by strangers and intruders. "The rights of the plaintiffs," said the Court, "under the act and the resolutions are peculiar, and *sui generis.* They have the right to use the lands set apart, for the single purpose of erecting thereon works for the manufacture of coarse salt, and for no other. And this right ceases, as to all the lands not so occupied, at the expiration of four years. This, we think, is the fair reading of the statute, and of the resolutions founded on it. It follows, that the plaintiffs had no legal or equitable right to occupy the land in question in this suit, for any purpose whatever, at the time when the defendants took possession of it ; and that they were, by consequence, intruders and trespassers on the lands of the State." And, as to the defendants, the Court said : "They have shown a title derived from the State, by letters patent, executed by the proper authorities. Now, though this patent be void, the plaintiffs, who are mere strangers and intruders, cannot set up its want of validity. It was held, in the case of *Cromelin* v. *Mintur*, (9 Ala. 594) that notwithstanding a patent was fraudulently obtained, or had issued in violation of law, and was, therefore, void, yet that a mere intruder could not set up the invalidity of the patent. And this principle we believe to be sound law. The statute makes every security tainted with usury *absolutely void;* and yet no principle is better settled, than that a *stranger* cannot set up that defense."

The case in Alabama, referred to in the citation, was reversed by the Supreme Court of the United States, (18 How. 87) but upon grounds which in no respect affect its force as an authority on the point under consideration.

In *Cooper* v. *Roberts* (18 How. 176) the plaintiff claimed under a · patent from the State of Michigan, issued upon a sale of section sixteen of a township granted by the United States to the State for the use of schools. The defendant contended, that the title to the land had never vested in the State of Michigan, but in the Minnesota Mining Company, under which company, it would seem, that he held ; and further, that if

Doll *v.* Meador.

the title had vested in the State, it had not passed to the plaintiff in conformity with her laws. The Court, in its opinion, examines at length the several positions advanced to support the first branch of the defendant's case, and holds that the title had vested in the State. But upon the second branch, the Court says: " The defendant further objects, that the officers of the State violated the statutes of Michigan in selling these lands after they were known, or might have been known to contain minerals. Without a nice inquiry into these statutes, to ascertain whether they reserve such lands from sale, or into the disputed fact whether they were known, or might have been known to contain minerals, we are of opinion that the defendant is not in a condition to raise the question on this issue. The officers of the State of Michigan—embracing the chief magistrate of the State, and who have the charge and superintendence of this property—certify this sale to have been made pursuant to law; and have clothed the purchaser with the most solemn evidence of title. The defendant does not claim in privity with Michigan, but holds an adverse right, and is a trespasser upon the land to which her title is attached.

" Michigan has not complained of the sale, and retains, so far as the case shows, the price paid for it. Under these circumstances, we must regard the patent as conclusive of the fact of a valid and regular sale on this issue."

In this case, the Minnesota Mining Company had originally taken possession of the premises, under a lease from the Secretary of War, and erected valuable improvements, for the purpose of mining; and, after the expiration of the lease, had entered the land in the appropriate Land Office, with the approval of the Secretary of the Interior—the entry being allowed, with a reservation of the rights of Michigan, as the section was claimed by her—and had received a patent with a similar reservation. The defendant, representing the company, was thereby brought in such relation to the common source of title, as to be able to question the right of the plaintiff, so far as it depended upon the action of Congress, or the officers of the United States. But when once that title had passed to the State, it was no concern of his whether her officers had complied with her laws in executing a patent to the plaintiff. With reference to the title, after it had passed to the State, he was a stranger, and an intruder upon the premises; and thus, not being in privity with Michigan, was in no position to call in question the validity of the acts of her officers.

22

Doll *v.* Meador.   .

None of the cases cited by the learned counsel of the defendants meet the question under consideration. *Polk's Lessee* v. *Wendall* (9 Cranch, 276) involved a controversy between claimants under conflicting patents. In *Patterson* v. *Winn* (11 Wheat. 381) the patent purported to be a grant for 7,300 acres of land, and the objection to its admissibility in evidence was, that it was issued without authority of law, and in violation of certain statutes of Georgia; which, it was alleged, prohibited the issuing of a grant to any one person, for more than 1,000 acres. The objection, as is manifest, was to the validity of the patent on its face; and though the nature and character of the defendant's title, or whether he relied upon naked possession alone, do not appear from the report of the case, yet the objection could have been taken, according to the views we have expressed, in either case. In *Wilcox* v. *Jackson* (13 Pet. 498) there was no patent. The plaintiff claimed under a Register's certificate of purchase, which was declared, by a law of Illinois, to be sufficient evidence of title to recover possession of the land it embraced, in an action of ejectment. The defendant was an officer of the United States, and held the land for them, and under their orders. He did not claim or pretend to set up any right or title in himself. The controversy was, in fact, between the holder of the certificate and the United States. *Stoddard* v. *Chambers* (2 How. 284) was an action between the assignee of a confirmee, under an Act of Congress, and a party claiming under a prior patent.

The case of *Summers* v. *Dickinson*, of this Court, (9 Cal. 554) is not, when considered with reference to the facts presented by the record, in conflict with the views we have expressed. Upon examination of the record, we find that on the trial, upon the offer of the patent, the defendant's counsel objected to its introduction in evidence, " unless plaintiff proved that a patent had issued to the State of California from the United States Government, under the Act of 1850." The Court below sustained the objection, and nonsuited the plaintiff. No other objection was made, and thus the construction of the Act of Congress of September 28th, 1850—" To Enable Arkansas, and other States to Reclaim the Swamp Lands within their Limits"—was the sole question presented on appeal, by the record, for consideration. The admissibility of the patent on any other grounds, or its effect when admitted, was a matter not before the Court. But aside from this, there is nothing in the language of the opinion which justifies the inference sought to be drawn from it. Undoubtedly, a patent issued by the Governor for any

Doll *v.* Meador.

land not embraced in the grant to the State, would be void for want of power to convey. We do not question this proposition ; we affirm it as sound. The point here is, as to the *status* of the party who can raise any question as to its validity, when it is regular on its face. Nor do we question the further proposition, that the defendant might have disproved the evidence of title furnished by the patent, by showing that the land in question was not included in the Act of Congress, or was within the exceptions contained in the act of this State. We only annex to the proposition the qualification, that to do this, he must first have brought himself in some privity with the common source of title. If he were a mere intruder, not possessing any claim of title, either from the General or State Government, he would not be in a position to question the regularity and correctness of the action of the officers of the State, in the selection of the lands or the issuance of the patent. Until some one appears prepared to trace title to himself from a common or paramount source, parties who are clothed with the solemn evidence of title furnished by the patent of the State may rest in security, without fear of any successful disturbance in the enjoyment of the property held by them, whether that property be a portion of the school lands or swamp lands granted to the State by the General Government.

Judgment affirmed.

On petition for rehearing, FIELD, C. J. delivered the opinion of the Court—BALDWIN, J. and COPE, J. concurring.

We do not find any considerations advanced in the petition for rehearing, which were not passed upon in the opinion already delivered. The Act of September 4th, 1841, does, as we stated, require the locations of the State to be made " conformably to sectional divisions and subdivisions," but it does not require the State to postpone the selections until the survey of the United States. It is only with reference to the old States, designated in the first section of the act, that the clause determining the time of the selections applies. As to the new States, the interest in the 500,000 acres vests upon their admission into the Union, and the selections by them are only subject to three qualifications : First, they must not be of lands reserved from sale by any law of Congress, or the proclamation of the President. Second, they must be in parcels of not less than three hundred and twenty acres each. And third, the parcels selected must be in such form as to correspond with the survey of the United States, when made. The selections will not,

of course, become absolute and definite until the survey; until then, the parcels selected may be subject to a possible reservation from sale; and when there is no such reservation, they may require some change in their exterior lines, so as to conform to the official sectional divisions and subdivisions. In the legislation of the State, provision is made so as to secure such conformity.

Rehearing denied.

NOTE.—It appears from the records in the office of the Surveyor General of California, that, under the Act of May 23rd, 1852, authorizing the location of school warrants, 159,520 acres were located of unsurveyed lands.