## DAVID S. TERRY v. CHRISTIAN MEGERLE.

LANDS GRANTED TO THE STATE—WHEN MAY BE SELECTED.—The State of California has no right to select or locate the five hundred thousand acres of land granted to her for purposes of internal improvement by the eighth section of the Act of

Congress of September 4th, 1841, until after the lands selected have been surveyed and sectionized by the proper officers of the Federal Government.

SAME—WHEN STATE ACQUIRES TITLE.—No title to any specific portion of said grant can vest in the State unless the land has been surveyed, and the selection is made of lands to which there is no subsisting valid claim by pre-emption or otherwise, and the selection is made in parcels conformably to sectional divisions and subdivisions of not less than three hundred and twenty acres, and the selection has been approved by the Federal Government.

PRE-EMPTIONERS—RIGHTS OF.—The State can make no valid selection under said Act of land in the possession of a *bona fide* pre-emptioner under the laws of the United States, nor can it convey any valid title therein to another.

STATE PATENT—PRE-EMPTIONER MAY ATTACK.—If the State selects as a part of said grant land in the possession of a *bona fide* pre-emptioner at the time of the selection, the pre-emptioner is in such privity with the common source of title that he can attack a patent granted by the State for the same in an action of ejectment brought by the patentee or his assignee.

APPEAL from the District Court, Fifth Judicial District, San Joaquin County.

The facts are stated in the opinion of the Court.

*Hall & Scaniker*, for Appellant.

The title in fee did not pass to the plaintiff by virtue of his patent from the State of California of January, 1862. The defendant is in privity with the Government of the United States, whose land it was, and thus his *status* with reference to the premises enables him to assail the patent. (*Doll* v. *Meador*, 16 Cal. 295.)

The State of California has not by her legislation manifested any disposition to defeat the wise policy of the Federal pre-emption system, but, on the contrary, in various provisions of her numerous laws affecting the sale or other disposition of land claimed as her own, and derived from the General Government, the rights of the Government and claims under it are recognized and carefully guarded.

This characteristic of State legislation is noticed by the Court in *Doll* v. *Meador*, and is observable in the Act of 1852 for the issuance of school land warrants; and as having some bearing on the case in hand, this disposition is unmistakeably shown in the positive inhibition of the sixth section of that Act, against the *location of warrants "upon any*

*lands at the time of such survey and location actually occupied and improved by actual settlers,"* with a mode of relief to the locator of such excepted land provided by means of floating his warrants.    (Sec. 7.)

In the Act of 1857 for patenting of school lands, the patent is postponed until a Government survey is had, and application to the *Federal* authorities, and an affidavit of the *non-existence of any adverse claim*, are made conditions *precedent* to the issuance.

By the Act of 1858, the consent and permission of the Register and Receiver must be procured, attended with full proof from the oath of the applicant and others, of the same fact, before the location is to be allowed by the State officers. This Act almost amounts to a legislative declaration, in so many words, of a want of power on the‑part of the State Government to prescribe any manner of selection of the lands donated under Act of Congress which could or might interfere with the *paramount right of adverse claimants under the Federal law.* For, what adverse claims can these be which it must be so satisfactorily shown nőt to exist, before the permission of the Government officers to locate is granted—unless they consist of the adverse claims.resting on reservations of the proposed land by the Government or settlers—actual settlers—claiming under it ?

Again : the Act of April, 1859, contains significant proofs of a similar deference to the law of the General Government. It provides for the issuance of patents for lands located by warrants under Act of 1852, or by selection, under Act of 1858. It carefully preserves the provision which runs through all its predecessors, of *pari materia*, and demands that the land shall be of the class "*subject to such location*," and effected in the Land Office of the United States, and *by and with the consent of the Register and Receiver thereof.*

But, in a further Act of the same year, authorizing the location of school land warrants on *unsurveyed land*, there is one express reservation "of the right of persons holding lands under the *pre-emption law of the State, or of the United States*,"

(Sec. 5,) and forbidding in section seven the location on reserved lands of the United States.

This expression of legislative will should be considered in fixing the *status* of the defendant in Court, and as furnishing an assurance of the favor with which Legislatures have always hitherto regarded and may be expected hereafter to regard a concession to a beneficiary of the General Government in the Courts of the State of the most liberal rule in the ascertainment of his position in Court to enable him to fully assert or defend his right.

As between the defendant and the Government of the United States, and to the extent of the defendant's quarter section, the question of defendant's right is "*res judicata,*" by the decision, three times made, in favor of that right by the highest authorities having power to inquire into and to pass upon that question.

The United States, acting by their appointed officers, exercising final and plenary power over the subject, have recognized the defendant, as to his own land, to have been a lawful possessor from October 2d, 1853, and to have become fully invested with the right to a conveyance in fee, all pre-requisites having been met and price paid. (*Barnard's Heirs* v. *Ashley's Heirs,* 18 How. 44, 45 ; *Elliott* v. *Pearsol,* 1 Peters, 340 ; *Bird* v. *Ward,* 1 Mo. 398 ; *Isaacs* v. *Steel,* 3 Scam. 97 ; *Perry* v. *O'Hanlon,* 11 Mo. 591.)

Congress has carefully legislated for the protection of the pre-emptor, excepting out of the operation of its patent to the State all lands not embraced by legislative grants, though, in fact, included in the lists. (Act Congress, Aug. 3d, 1859.)

If, then, the right of the defendant attached, it began with the settlement, which was, in both instances, in October, 1853, and the patent, when issued, relates to the date of the entry. (*Taylor et al.* v. *Brown,* 5 Cranch, 234.)

The land was not subject to the plaintiff's location in 1854, neither by the Donation Act nor our State Act of 1852. These laws direct a selection "*of any vacant or unappropriated*

*lands*" belonging to the United States and within their State "*subject to such location.*"

In determining this question, which is as to the priority of right as between the United States and California, two things should be borne in mind: First—That the State claims as a donee of the liberal Federal bounty, and not as a purchaser for value; and Second—That by the Constitution of the United States the power to regulate and dispose of the public domain rests with the General Government, as proprietor, and that the State has solemnly engaged not to interfere with the exercise of the Federal power of disposal, "*and shall pass no law and do no act whereby the title of the United States to and right to dispose of the same shall be impaired or questioned.*" (See Act of Admission of California, Sec. 3.)

In a contest between a pre-emption claimant on *unsurveyed public land*, and the locator of a State warrant of the same land, occurring in Louisiana, it was decided by the Department of the Interior that the location of the warrant was invalid, *not being upon public land.* By reason of the pre-emption claim, "*the land was not of that public description to which the State is by law confined;*" that the selection by the State was void, by reason of the *prior valid legal right of the pre-emptor.* (*Vester* v. *Dinkgrove*, Lester's Land Laws, 451–454 ; Pre-emption Act for California, 1853.)

The State cannot grant what she does not own, and the statutory declaration that the patent shall vest the fee, does not accomplish that result. (*Haye* v. *Swain's Lessee*, 5 Md. 247 ; *Wilcox* v. *Jackson*, 13 Peters, 498.)

The States to which five hundred thousand acres of land were given for internal improvements, are not entitled to take any land to which pre-emption rights exist. (Opinion of Attorney-General July 11th, 1842, Vol 4, p. 71.)

The right to assail the patent for the reason that the land was not the property of the State, and so not subject to the laws authorizing the issuance thereof, is conceded in *Winter* v *Crommelin*, 18 How. 87.

*Patterson, Wallace & Stow*, for Respondent.

David S. Terry, in the location of the warrants in 1854, was the agent of the State, and authorized to act for the State in that behalf.    By the letters patent to him in 1862, issued by the State, he became the vendee and grantee of the State, and clothed with just such rights and title as the State had heretofore.

The title of the State of California to the land in controversy accrued to her on the *ninth day of September*, 1850, the day she was admitted into the Union.

In *Doll* v. *Meador*, 16 Cal. 315, Mr. Chief Justice Field, in speaking of the Act of 1841, says: "Its words are, 'there shall be, *and hereby is granted*,' words which operate to vest the specific quantity in each new State *immediately upon its admission into the Union*." He proceeds then to enumerate the qualifications and clogs, to which *alone* this vested title of the new State is subjected, and they are *only*:

1. The necessity of conforming the location to the public surveys.

2. Reservation of the land by Act of Congress.

3. Reservation of the land by proclamation of the *President*.

As in the case at bar, it appears from the record that neither the lines of the *public surveys*, nor *Congress*, nor the President, interfered with the location of the land patented to the respondent.    "We do not perceive, either in the language of the Act or the object to be secured, any limitation upon the right of the State to proceed *at once to take possession and dispose of the quantity to which she is entitled by the grant*." (Id. 315.)

And again, on page 320, the Chief Justice, after setting forth the form and recitals of the State patent to Doll, says: "It is under this patent that the plaintiff claims title to the premises in controversy, and it is clear that if the tract embracing them were subject to location as part of the five hundred thousand acres *that were not reserved from sale by any law of*

*Congress or the proclamation of the President, his claim is good, and a valid title vested in him.*"

Again: The Statute of California declares (Acts of 1859, p.   , section four) "that such patent (as respondent has had) *shall vest in the grantee therein named a good and valid title in fee simple to the lands therein described.*"

If, indeed, the respondent be not seized of this land, it must be because Acts of the State Legislature, Acts of Congress, and the most solemn and well considered adjudications of the highest judicial tribunal, have exhausted their united efforts in vain.

1. The grant to the State of California, September 9th, A. D. 1850 ;

2. The actual settlements of respondent's grantors, A. D. 1852 ;

3. The location of the State land warrants by respondent, A. D. 1854 ;

4. The filing of that location in the United States Land Office by respondent, A. D. 1856 ;

5. The patent of the State of California to respondent, A. D. 1862—United, constitute a title in the respondent rather better than the average of titles upon which recoveries are accustomed to pass in this Court.

The view of this Court, as announced in *Doll* v. *Meador*, in reference to the construction of the Act of 1841, operating to vest a present interest in the State, is fully sustained in the case of *Richard F. Veeder et al.* v. *Joshua J. Guffey*, 3 Wisconsin, 502. That case involved the construction of an Act of Congress, passed August 8th, 1846, (9 U. S. Statutes at Large, 83,) to grant to the (then future) State of Wisconsin a quantity of land equal to one half of three sections in width, "to be selected under the direction of the Governor of said State, and such selections to be approved by the President of the United States." The State of Wisconsin was admitted into the Union on the 29th day of June, 1848.

The Court say : "At the time of the passage of the Act of Legislature for the disposal of their lands, none of the lands

had been selected by the Governor and approved by the President; but the title of the State was as complete as it ever has been to the certain quantity of land granted." No further act of the United States was necessary, nor was any other act ever done or performed to vest the fee in the State. The selections by the Governor and the approval by the President were acts of partition *only*, not of conveyance, applying the reasoning of the Wisconsin case.

The Supreme Court of California, in *Doll* v. *Meador*, 320, say: " When the selections and locations are once made, pursuant to her directions, of lands not reserved but subject to location, the general gift of the quantity becomes a particular gift to the specific lands located, vesting in her a perfect and absolute title to the same, and that title passes by her patent."

4. Against *this legal title* of the respondent, perfect and vested in him, the appellant *confessedly sets up no legal title whatever*.

In the action of ejectment the *legal title must prevail*.

The appellant by his answer does not set up any equitable defense, nor pray any equitable relief. He demands judgment in his favor, and *is in* this Court insisting upon such a judgment. The claim of the appellant, such as it is, has its origin in a settlement made on the premises in October, 1853. The origin of the title of this State is at least as old as the year 1850. As we have also seen, at that time the State became a tenant in common with the United States Government in the public lands within her limits. The undivided but absolutely vested quantity of land was five hundred thousand acres. She had as early as 1850 a right to locate that quantity as she chose, subject only, as we have seen, to the form of its location, and to reservations by Congress, or by the proclamation of the President. When so located it took effect by relation to the time of the admission of the State into the Union. At that time the pre-emption laws of the United States under which the appellant asserts his acquisition of rights were not extended to California. Any rights which he possesses were

Terry v. Megerle.

subsequently acquired, and must be subordinated to such location by the State.

The appellant's counsel urge upon the Court that the State has never received a patent from the United States. She never will, for the Act of 1841 is itself a legislative grant to her as determined in *Doll* v. *Meador*. Suppose, then, that appellant has a right to attack the respondent's patent, of what avail would such an attack be?

Suppose that appellant has *title*; it is subordinated to the title of the State, which is older than appellant's asserted title. The counsel states that he seeks to attack this patent on the grounds that the *State had no title*, for the reason that the land had been reserved by the United States from selections by the State—how or where it was so reserved he does not inform us. But if the doctrine announced in *Doll* v. *Meador* be sustained, the appellant cannot attack respondent's patent. The Supreme Court of California in that case say, (page 325): "But if the authority to issue the patent depend upon the existence of particular facts in reference to the condition or location of the property or the performance of certain antecedent acts, and officers have been appointed for the ascertainment of these matters in advance, who have passed upon them, and given their judgment, then the patent, though the judgment of the officers be, in fact, erroneous, cannot be collaterally attacked by parties showing title subsequently."

By the Act of the Legislature of 1859, such proceedings are provided for in the State Land Office, and the patent is the result of those proceedings.

These proceedings, authorized by the Legislature, are in fact authorized by the Act of Congress of 1841, (Statutes at Large, p. 455, Sec. 8,) "the selections of all the said States to be made within their limits respectively, in such manner as the Legislature thereof shall direct."

Here, the Legislature of California made the necessary directions, appointed the officers to determine the facts, and upon determination, the patent is based. The appellant desires in his attack "upon this patent, to show that their officers *erred*

*in their judgment,"* *i. e.,* that there were certain facts or matters which ought to have been differently determined by the State authorities; this is the very thing which the case of *Doll* v. *Meador,* as we have seen, denies. The appellant contends that the condition of this land was such (by reason of his settlement upon it) that a patent ought not to have issued, but the authorities issuing the patent determined otherwise; it was their duty to consider that matter.

Admitting, for the purpose of the argument, that their determination was erroneous, it cannot be collaterally annulled. He says that the fact that all the land was not vacant was a reason why the patent should not issue; if so, the State land officers have determined that it *was* vacant. By the provisions of the Act of 1859, p. 339, all the world was made a party to the issuance of patent, and the determination of the facts upon which the patent should issue; process was served by written and printed notices, "and all persons holding adversely may be entitled to appear before the Register and contest the application for such patent." If the appellant held adversely and desired to prove that the land was not vacant, but occupied by himself, and therefore not properly the subject of a patent, he might then have done so, but not having done so, then he will not be permitted to collaterally assail the patent on the same grounds now, because if such patent could be thus assailed, why did the law require process, etc., before its issuance? It seems, according to the position of the appellant, that everything is left open to inquiry, notwithstanding.

But the counsel says that the State has no power to make this regulation providing for a hearing before the Register.

In *Doll* v. *Meador,* p. 319, this Court recites this very provision of the statute, and no intimation is given that it involved any excess of authority, and it is of this legislation that the Court say, p. 324 : "On the contrary, her legislation on the subject has been eminently *beneficent* and just."

But the State, in making this regulation, was fixing the manner of making the selections of her five hundred thousand

acres, which she was authorized to direct the manner of by the Act of Congress of 1841. Nor does the exercise of that power, thus conferred by the Act of 1841, make the State obnoxious to the charge of "interfering" in the disposal of the public lands, in defiance of the Act of September 9, 1850, admitting her into the Union.

*George W. Tyler*, for Appellant, in reply.

The counsel for respondent insists that the point argued has been decided in his favor in the cases of *Doll* v. *Meador* and *Van Valkenburg* v. *McCloud.* This virtually admits that if we are in a situation to attack a patent, then this case must be reversed.

I submit that the only question *decided* in the case of *Doll* v. *Meador* was, that the relation of the defendant in that suit to the *title* was not such as to allow him to question the validity and efficacy of the patent.

The Court, in speaking to this point, say : "The question here relates to the *status* of the parties who are permitted to assail the patent." " Can any one who has no other relation to the property sought to be recovered than that of mere possession" (that is to say, a naked trespasser upon the land without any claim of title) " take the position of assailant on that ground ?"

It will thus be seen that this Court, in *Doll* v. *Meador*, virtually decides that if a party is "invested with the title of donor," or has "some claim of title," he may attack the patent in an action of ejectment.

If the learned counsel contends that a pre-emptioner who has paid for the land and got a certificate of purchase, which is conclusive proof that he has complied with all the requirements of the pre-emption laws, has no " claim of title " under the Government, then his proposition is too absurd to require an answer, and this point is not touched upon in *Van Valkenburg* v. *McCloud.*

The Registers and Receivers of districts, and the Commissioner of the General Land Office, and the Secretary of the

Interior, are the persons selected by the Government to pass upon conflicting claims to land, and their decision is conclusive. (16 Ark. 25; 1 Pet. 340; 14 Ill. 343; 13 Ala. 137; 13 Pet. 511; 9 Mo. 183; 16 How. 64; 16 How. 48.) And especially is it conclusive when both parties have appeared and had a fair hearing.

All the officers above mentioned have passed upon the conflicting claim of plaintiff (who claims under or through the State) and defendant (who claims as a pre-emptioner) after a hearing of both parties, and they have decided that the land belongs to defendant.

If we are in a condition to attack the patent, as I think it has been conclusively shown we are, then it is perfectly competent for us to set up the defense in this suit under our system. (*Kittridge* v. *Breand,* 4 Rob. 83; 13 Pet. 436; 13 Cal. 373, 486.)

The construction of the Act of April 16th, 1859, given to it by the Attorney-General of the State, and acted upon by the State Register, is this: that he will not allow a party claiming as a pre-emptioner to contest the right of a party claiming under the State in his office. He allows a contest only between parties each of whom claims under the State.

Under that construction, any one whose conscience is sufficiently pliable can get a patent from the State as against a pre-emptioner, no matter how good the latter claim may be.

A pre-emptioner is entitled to equal protection under our law with one who claims by virtue of a patent from the State.

By the Court, SANDERSON, C. J.

This is an action of ejectment. The case was tried in the Court below without a jury. The plaintiff had judgment, and the defendant appeals. The facts as found by the Court are acquiesced in by both parties, and the question to be determined is whether the plaintiff, upon those facts, is entitled to recover the land in controversy.

The findings are as follows: "First—That in January, 1862, the plaintiff obtained from the State of California a patent

for the land in controversy, pursuant to the several Acts for the disposal of the five hundred thousand acres of land granted by the United States to the State of California.

"Second—That the plaintiff and those under whom he claims have been in possession by inclosure and cultivation of all the land embraced in said patent, except the forty acres in controversy, since the year 1852, but neither he nor they have ever been in possession of any part of the land sued for.

"Third—That in 1854, after the public lands of which the premises are a part had been divided into townships, and before they had been sectionized, the plaintiff located two school land warrants under the Act of 1852. This location embraced the premises in controversy, and the lands for which the patent issued to him subsequently. The location was made by the County Surveyor of San Joaquin County, by actual survey, and the survey was duly recorded in the San Joaquin County Clerk's office, in November, 1854.

"Fourth—On the 14th day of May, 1856, plaintiff made the location and filed the warrants in the United States Land Office at Marysville.

"Fifth—The defendant, a citizen of the United States, settled upon that portion of the land in controversy, which is a part of the northwest quarter of section twenty-one, in October, 1853, and erected a dwelling house, with intent to secure a pre-emption right to a quarter section under the Acts of Congress of September, 1841, and March, 1853. The land at that time was unsurveyed, and ever since that time defendant has occupied and cultivated that portion of the northwest quarter of said section which is now in controversy.

"Sixth—In the month of May or June, 1855, the land was divided into sections and other legal subdivisions by the United States Government, and the defendant, on the 2d day of October, 1855, filed his declaratory statement for said quarter section in the Land Office at Benicia, to which district the land belonged, the plat or survey of the land not having been entered and filed in said office.

"Seventh—The land in controversy was afterwards trans-

ferred to the Marysville District, and the defendant, after the return of the approved plat or survey to the Marysville office, filed in that office his declaratory statement, in due form of law, on the 16th day of April, 1856.

"Eighth—In 1860, at the Land Office in Stockton, (to which district the land then belonged,) the defendant made proof of his settlement and pre-emption, and having made payment for said quarter section, received from the Register and Receiver a certificate of location and purchase of the same in due form of law.

"Ninth—One John H. Megerle, now deceased, and whose heir-at-law and representative is the defendant, in the month of October, 1853, settled upon that portion of the land in controversy embraced in the southwest quarter of said section twenty-one, and erected a house thereon, intending to pre-empt the same under the laws of Congress, the land being unsurveyed public land, and continued to reside on and cultivate the same until 1858, when he died.

"Tenth—The land being sectionized, and the plats returned to the Marysville Land Office, said John H. Megerle, while yet in life, to wit: on the 16th day of April, 1856, filed in said Marysville office his declaratory statement for a quarter section of land embracing the west half of the southwest quarter of said section twenty-one, and in April 1859, proof was made of the entry and settlement of the said John H. Megerle, and of his notice before the proper land officers, and the defendant has been thence hitherto ready and willing to make payment therefor.

"Eleventh—The defendant was in possession of the land in controversy, adversely to the plaintiff, at the time this action was brought.

"Twelfth—That the plaintiff, claiming the quarter section of land on which the defendant settled by virtue of his location of said school warrants, did contest the right of the said defendant before the officers of the Stockton Land Office to pre-empt the same, and thereupon such proceedings were had before the officers of the Government of the United States in

the matter of said contest, as that the Secretary of the Interior, on the 9th day of December, 1859, and again on the 14th day of June, 1861, did adjudge and determine that the said defendant had a valid legal right to said quarter section under the pre-emption laws of the United States."

The eighth section of an Act of Congress passed September 4th, 1841, entitled "An Act to appropriate the proceeds of the sales of the public lands, and to grant pre-emption rights," reads as follows:

"Sec. 8.    There shall be granted to each State specified in the first section of this Act five hundred thousand acres of land, for purposes of internal improvements; *provided*, that to each of the said States which has already received grants for said purpose there is hereby granted no more than a quantity of land which shall, together with the amount such State has already received as aforesaid, make five hundred thousand acres; the selection in all of said States to be made within their limits, respectively, in such a manner as the Legislature thereof shall direct, and located in parcels conformably to sectional divisions and subdivisions, of not less than three hundred and twenty acres in any one location, on any public land except such as is or may be reserved from sale by any laws of Congress or proclamation of the President of the United States; which said location may be made at any time after the lands of the United States in said States respectively shall have been surveyed according to existing laws.    And there shall be and hereby is granted to each new State that shall be hereafter admitted into the Union, upon such admission, so much land as, including such quantity as may have been granted to such State before its admission and while under a Territorial Government, for purposes of internal improvements, as aforesaid, as shall make five hundred thousand acres of land, *to be selected and located as aforesaid*."

Under the last clause of the foregoing section, California, upon her admission into the Union, became vested with an interest in the public lands within her borders to the extent

of five hundred thousand acres, (having never received any previous grants,) the same, however, to be selected and located in the manner and at the time specified in the immediately preceding part of the section, to which the words at the close of the section "to be selected and located as aforesaid," directly refer. The words "to be selected and located as aforesaid," in our judgment, include both the manner and the time of the selection and location, and not the manner merely, as was held in *Doll* v. *Meador*, 16 Cal. 315. The language is not that the land shall be selected in the *manner* as aforesaid, but "as aforesaid." That portion of the section to which the words "as aforesaid" refer, prescribes not only the manner of the selection, but the time also, and by no rule of construction can it be said that they refer to the one and not to the other. There is no ambiguity in the language used; on the contrary, the meaning is too plain and obvious to admit of doubt. The language is "located as aforesaid," that is to say, in parcels of not less than three hundred and twenty acres, conformably to sectional divisions and subdivisions, and after the survey has been made. This construction is not only justified by the natural and grammatical import and meaning of the language used, but is sustained by the necessities of the subject matter. The land must be located in parcels, conformably to sectional divisions and subdivisions, of not less than three hundred and twenty acres. How can this be done until after the lands have been surveyed by the proper officers of the Federal Government? The grant imposes conditions as to the quantity, manner of selection and location, and time of location, and under it no title to any specific land can vest in the State until all of those conditions have been complied with. The State has no more right to select and locate lands before the survey has been made, than she has to locate it in tracts of a hundred and sixty acres each, or without regard to the sectional divisions and subdivisions of the United States survey. The mode, time, and quantity of the selection and location are fixed by the Act. All else is left to the legislative wisdom of the State. Agents may be appointed by the State for the purpose of select-

Terry *v.* Megerle.

ing and locating the land granted to the State, and certifying the same by proper lists to the proper land officers of the Federal Government. But such selections and locations must be made upon lands to which there is no subsisting valid claim, by pre-emption or otherwise, or they cannot be recognized and upheld as valid by the Federal Government. The approval of the Federal Government must be had before the title of the State can attach to any specific land, and such approval ought not and cannot be had where there is a valid subsisting claim, under the laws of Congress, by pre-emption or otherwise, which has attached to the land before the selection is made by the State. This course is made necessary in order to preserve uniformity in the land system of the Federal Government, and to enable it to preserve intact its policy toward actual settlers upon the public lands. The uniform policy of the Federal Government has been to invite and encourage the settlement of her public lands by a judicious system of pre-emption laws, whereby settlers are enabled to secure the title to the land cultivated and improved by them in preference to all others. A pre-emptioner is as much the favored beneficiary of the Federal Government as a State, and equally entitled to her protection. The unoccupied land is as open to the settlement of the pre-emptor as to the selection and location of a State, and when he has once placed his foot upon the spot of his choice he cannot be deprived of it by any system of State selection and location, provided he complies with the laws of Congress; nor need he look elsewhere than to the Federal Government for his title. Upon land in the possession of a *bona fide* pre-emptioner the State can make no valid selection and location, nor can it convey any valid title therein to another. Such land has a prior valid claim upon it and is not subject to State selection. Any other theory would lead to confusion and to Federal and State conflict. So careful is the Federal Government of the rights of pre-emptioners that it has provided that where any settlement, by the erection of a dwelling house or the cultivation of any portion of the land, shall be made upon the sixteenth and thirty-sixth sections

granted for the purposes of public schools, other lands shall be selected by the proper officers of the State in lieu thereof. (Act of March 3, 1853, Sec. 7, Wood's Digest, p. 749.)

The sixth section of the Act just cited provides, "that all the public lands in the State of California, whether surveyed or unsurveyed, with the exception of sections sixteen and thirty-six, which shall be and are hereby granted to the State for the purposes of public schools, in each township, and with the exception of lands appropriated under the authority of this Act, or reserved by competent authority, and excepting also the lands claimed under any foreign grant or title, and the mineral lands, shall be subject to the pre-emption law of the 4th of September, 1841, with all the exceptions, conditions, and limitations therein, except as herein otherwise provided; and shall, after the plats thereof are returned to the office of the Register, be offered for sale, after six months public notice in the State of the time and place of the sale, under the laws, rules, and regulations now governing such sales, or such as may be hereafter prescribed; *provided,* that where unsurveyed lands are claimed by pre-emption, the usual notice of such claim shall be filed within three months after the return of the plats of surveys to the land offices, and proof and payment shall be made prior to the day appointed by the President's proclamation for the commencement of the sale, including the entry of such claims to be made by legal subdivisions, according to the United States survey, and in the most compact form."

Under the provisions of this section the defendant proceeded to obtain the title of the United States to the land in controversy. He settled upon it in October, 1853, seven months after the passage of the Act, with the intent to secure a pre-emption right thereto. At that time the land was vacant and unoccupied. He erected a dwelling house thereon, and ever since that time has resided thereon and cultivated the same. In 1854 the land was surveyed and divided into townships, and in 1855 into sections and other legal subdivisions, by the Federal Government. The defendant, within

the time prescribed by the laws of Congress, to wit: on the 16th day of April, 1856, filed in the proper Land Office his declaratory statement, and within the time prescribed made proof of settlement and payment of the purchase money; and, in 1860, obtained from the proper officer a certificate of location and purchase, in due form of law, of the land in controversy.

The plaintiff, on the contrary, sought to obtain title through the State, and under its laws. In 1854, after the land was divided into townships, and before it was divided into sections and other legal subdivisions, and before the plats were returned to the proper office, the plaintiff took his first step toward obtaining his title, by locating two school land warrants pursuant to the provisions of the Act of the State Legislature of 1852. On the 14th day of May, 1856, the plaintiff made his location and filed his warrants in the United States Land Office, and in January, 1862, he obtained a patent from the State for the same land.

Thus it appears that the defendant was in possession as a pre-emptioner before and at the time at which the plaintiff located his warrants; and the declaratory statement of the defendant was on file in the proper Land Office before and at the time the plaintiff entered his location and filed his warrants. It further appears that under these circumstances the plaintiff contested the right and claim of the defendant before the officers of the proper Land Office, and, on appeal to the Secretary of the Interior, a decision was twice rendered against him, and establishing the validity of the defendant's claim; yet, by some means which do not appear, he afterwards, and after the defendant had obtained his certificate of location and purchase from the proper officers of the Federal Government, obtained his patent from the State of California.

Regarding the plaintiff as the agent of the State for the purpose of selecting and locating the land in question, as is claimed by his counsel, and which we concede, he made his selection and location upon land to which the defendant's pre-

emption right had already attached. This, as we have already seen, he could not do, and by his acts the State acquired no title whatever to the land in controversy, and of course could pass none to him by her patent. When two or more persons have settled upon the same quarter sections of land, the right of pre-emption is in him who made the first settlement. (Act of Sept. 4, 1841, Sec. 11.) The State occupies no better or stronger position than a *bona fide* pre-emptioner; and if her selection be subsequent to that of a *bona fide* pre-emptioner, her right must yield to his.

The only question remaining is, whether under the circumstances of this case the defendant can attack the plaintiff's patent; and upon this point there can be no doubt, if our previous reasoning be correct. By his certificate of location and purchase, the defendant became vested with the title of the United States to the land in question, upon which he could maintain and defend an action of ejectment under the laws of this State. (Wood's Dig. p. 1044.) We have also shown that the State acquired no title to the land in question by the acts of her agent, the plaintiff in this case, because, at the time of his location, the land was reserved from selection by the pre-emption laws of the United States, and that therefore the title of the State did not attach to the land in question, and nothing passed to plaintiff by her patent.

The third section of the Act of the Legislature which authorizes the location of school land warrants, and under which the plaintiff made his location, provides as follows:

" Sec. 3. The parties purchasing such warrants, and their assigns, are hereby authorized in behalf of this State to locate the same upon any *vacant* and *unappropriated* lands belonging to the United States within the State of California, *subject to such location;* but no such location shall be made unless it be made in conformity to the law of Congress, which law provides that not less than three hundred and twenty acres shall be located in one body."

By necessary implication, the purchaser and his assignee is

prohibited from locating the warrants upon land which is already occupied. We have, therefore, a case where the State has issued a patent without having any title to the land, and contrary to the provisions of one of its own statutes.

In *Patterson* v. *Winn*, 11 Wheat. 380, the Supreme Court of the United States said: "We may, therefore, assume, as the settled doctrine of this Court, that if a patent is absolutely void upon its face, or the issuing thereof was without authority, or was prohibited by statute, *or the State had no title*, it may be impeached collaterally in a Court of law in an action of ejectment."

The doctrine of *Patterson* v. *Winn* is expressly recognized and approved in *Doll* v. *Meador*, 16 Cal. 324, and Mr. Chief Justice Field there said: "We admit, in general terms, the correctness of the doctrine declared in *Patterson* v. *Winn* to be the settled doctrine of the Supreme Court of the United States, that if a patent be absolutely void upon its face, or were issued without authority, or were prohibited by statute, or the State had no title, it may be impeached collaterally in an action of ejectment." Subsequently, in the same opinion, Mr. Chief Justice Field declares by whom, in such cases, a patent may be impeached, and by whom not, in the following language: "Nor do we question the further proposition, that the defendant might have disproved the evidence of title furnished by the patent, by showing that the land in question was not included in the Act of Congress, or was within the exceptions contained in the Act of this State. We only annex to the proposition the qualification that to do this he must first have brought himself in some privity with the common source of title. If he were a mere intruder, not possessing any claim of title either from the General or State Government, he would not be in a position to question the regularity and correctness of the action of the officers of the State in the selection of the lands and the issuance of the patent."

In the present case, as we have endeavored to show, we have two grounds upon which a patent may be impeached collaterally in an action of ejectment; and a party who, by

reason of his privity with the common source of title, has a *status* in Court which enables him to question its validity.

The judgment is reversed, and the Court below directed to enter a judgment upon the findings in favor of the defendant.

SHAFTER, J., and SAWYER, J., concurring specially:

We concur in the judgment, and in the opinion except so far as it questions that portion of the opinion in *Doll* v. *Meador* relating to the time when a location can be made by the State. Upon that question we express no opinion, for the reason that we do not regard it necessary to the decision of this case.